COOK *vs.* THE BERLIN WOOLEN MILL COMPANY and others.

EQUITY: PRIVATE CORPORATIONS: SALES. *(1–3) Conveyance of property of private corporation to its directors. (4–6) Sale of such property to ministerial officer of the corporation. (7) Ratification. (8) Right of action to avoid such sale.*

1. Equity deals with the directors of a private manufacturing corporation as *trustees* of the corporation; but with merely ministerial officers (in this case the superintendent of the company's mills), as *agents*.
2. It is settled in this state that trustees cannot purchase, on their own account, any interest in property of their *cestui que trust*.
3. While a contract of sale of real property of their *cestui que trust* to a stranger remains *executory*, trustees cannot purchase of such stranger;

and a conveyance to themselves and such stranger, made in pursuance of such a purchase, is voidable at the suit of the *cestui que trust.*

4. While a mere agent is absolutely disqualified to purchase property of his principal only where his agency is so connected with the sale as to make it his duty to obtain the best terms for his principal on such sale, yet equity regards with great jealousy any purchase by an agent from his principal.

5. Where the nature of the agency has given the agent control in the management of the principal's property, and peculiar opportunity of knowing its condition and value, a purchase of it by the agent will be avoided at the suit of the principal, unless the purchaser *make it affirmatively appear* that the transaction was fair, and that he imparted to the principal all his information concerning the property, and acted throughout *uberrima fide.*

6. The board of directors of a manufacturing company sold their mill and machinery to the person employed by them as superintendent thereof, and who had charge of the books, accounts and other papers of the corporation, and the principal charge of its general business. *Held,* that the sale is voidable, in the absence of affirmative proof to sustain it, of the kind above described.

7. The mere facts that, after a conveyance of corporate property to the purchaser at a voidable sale, he offered to reconvey — the evidence leaving it in doubt whether or not upon condition, — and that a meeting of the stockholders of the corporation failed to take any action upon such offer, do not show a ratification.

8. While the right of action to avoid such a sale and conveyance is primarily in the corporation, yet, upon refusal of its governing body to sue, the action will lie in favor of a stockholder.

APPEAL from the Circuit Court for *Green Lake* County.

The *Berlin Woolen Mill Company* was organized as a corporation under ch. 86, P. & L. Laws of 1870, which required that it should have a capital stock of $20,000, in shares of $100 each. The plaintiff, owning twenty shares of stock in the company, brought this action in behalf of himself and the other stockholders, to avoid a sale and conveyance of the company's real estate (including its woolen mills and machinery), made and executed in May, 1874. Before commencing the action, plaintiff requested the company to do so, but his request was disregarded.

The facts found by the court were as follows: "1. That at a meeting of the stockholders of said corporation, duly and legally called and held on the 2d of May, 1874, by a resolution then and there adopted by said meeting of stockholders owning a large majority of the stock of said corporation, the board of directors were duly authorized to sell said real estate and machinery upon the best terms they could get.

"2. That in pursuance of the authority and wishes of said stockholders, the said board of directors, at a meeting duly held on the 8th of May, 1874, made an agreement with D. L. Harkness, to sell to him said real estate, machinery, and a portion of the personal property; said real estate and machinery for the sum of $8,000.

"3. That after said sale, and before the deed therefor was executed, Harkness made an arrangement with the defendants Yates, *Foote*, *Reese* and Dodson, whereby they were to become jointly interested with him in the property so purchased by him, and in the business that should thereafter be prosecuted with said property; and that said deed was thereafter executed to them jointly by the request of Harkness.

"4. That at the time of the agreement to sell the mill and machinery to Harkness, on the 18th of May, 1874, there was no agreement or understanding between the defendants *Reese* and *Foote* and said Harkness, that they, or either of them, should, at any time, be parties or a party with him in said purchase, or have any interest therein, and no agreement in reference thereto, and no intention on the part of said *Reese* and *Foote* to become, in any manner, interested in said purchase or in said property, or in any business to be thereafter connected therewith.

"5. That said sale was made to Harkness in good faith by the board of directors, and not with intent to defraud the plaintiff or any other stockholder.

"6. That the sum of $8,000 was, at the time of said sale, a fair and adequate price for said mill and machinery, and that

the sale thereof was necessary and proper under the circumstances.

"7. That on the 22d of May, 1874, the defendants David W. Carhart, C. A. Peck, *R. T. Reese, A. D. Foote*, together with E. S. Burr, who is not a party to this action, were directors of said corporation, and said Carhart and Peck were president and secretary, respectively, of said board of directors.

"8. That on said 22d of May, 1874, the said D. W. Carhart, as president, and C. A. Peck, as secretary, executed a deed of the real estate and machinery described in the complaint, from the said *Berlin Woolen Mill Company* to the defendants Harkness, *Foote*, Yates, *Reese* and Dodson, and thereby conveyed to them the title to said property.

"9. That said conveyance was made by said president and secretary by and in pursuance of a resolution of the board of directors, unanimously adopted by said board, at a meeting thereof duly held, directing the same to be made."

Exceptions were taken to all of these findings; but, in view of the grounds on which the cause was determined here, it is not necessary to state the evidence.

The defendant Harkness had been the superintendent and general manager of the company from about the period of its organization.

Those grantees in the conveyance who were directors in the company, are distinguished by *italics* in the foregoing statement.

The circuit court held the sale not to be fraudulent, and rendered judgment for the defendants; from which the plaintiff appealed.

For the appellant, a brief was filed by *Wm. P. Lynde*, and the cause was argued orally by *H. M. Finch*. After discussing the questions of fact, they contended that equity will avoid a purchase of property by the trustee thereof, or by any person who had a duty to perform in respect to the property which was inconsistent with the character of a purchaser; and

Cook vs. The Berlin Woolen Mill Company and others.

that it will do this without fraud in fact. *Gillett v. Gillett*, 9 Wis., 194; *Pickett v. School District*, 25 id., 553; *In re The Taylor Orphan Asylum*, 36 id., 534; *Bergen v. Bennett*, 1 Caines' Cas., 19; *Van Horne v. Fonda*, 5 Johns. Ch., 388; *Van Epps v. Van Epps*, 9 Paige, 237; *Moore v. Moore*, 5 N. Y., 256; *Gardner v. Ogden*, 22 id., 327; *Ten Eyck v. Craig*, 62 id., 419; 66 id., 555; 36 Ind., 66; 16 Md., 456; 18 Ohio St., 182–3; *Michoud v. Girod*, 4 How. (U. S.), 506; 7 Wall., 302; 5 Cent. Law Jour., 528; Leading Cases on Trusts, 96–111, 466; *Keech v. Sandford*, Cas. temp. King, 61; *Griffin v. Griffin*, 1 Schoales & Lef., 352; *Eyre v. Dolphin*, 2 Ball & B., 290; *Tanner v. Elworthy*, 4 Beav., 487; *Jones v. Kearney*, 1 Drury & War., 134; note to *Waters v. Bailey*, 21 Eng. Ch., 224; *York Building Co. v. Mackenzie*, cited in 3 Sugden on V. & P., 240, and 1 Leading Cas. in Eq., 72, 109; *Aberdeen Railway Co. v. Blaikie Bros.*, 1 Macqueen, 461; *Hamilton v. Wright*, 9 Cl. & Fin., 123; *Ex parte Lacey*, 6 Ves., 626; *Parker v. McKenna*, L. R., 10 Ch. App. Cas., 118, 125; *Fox v. Mackreth*, 2 Bro. C. C., 400; *Oliver v. Court*, 8 Price, 127.

For the respondents, briefs were filed by *Waring & Ryan*, and *S. U. Pinney*, of counsel; and the cause was argued orally by *Mr. Waring* and *Mr. Pinney*. After arguing at length the questions of fact, they contended, 1. That the purchase of the property by Harkness was entirely lawful. His position was merely that of an overseer or agent of limited authority. He was under no equitable disability to purchase, any more than a traveling agent, bookkeeper or operative of the corporation, having a more or less intimate knowledge of its affairs; because he did not occupy such a position that his interest as a purchaser was in conflict with his duty as superintendent or general manager. He was not an agent of the company to sell the property, owed no duty to it or to the stockholders in regard to such sale, which was not equally due from any other stockholder, and had no more control over the sale than

any other stockholder. He cannot, therefore, be considered as having stood in any fiduciary position in relation to the subject matter of the sale. In support of this view, counsel cited and commented ·upon *Whichcote v. Lawrence,* 3 Ves., 740; *Aberdeen Railway Co. v. Blaikie,* 1 Macqueen, 461; *Pickett v. School Dist.,* 25 Wis., 553; *Torrey v. Bank of Orleans,* 9 Paige, 649; *Fox v. Mackreth,* 2 Cox, 320; *S. C.,* 4 Bro. P. C., 258; 1 Lead. Cas. in Eq., notes on pp. 199, 200, 209, 215; *Hawley v. Cramer,* 4 Cow., 736; *Smith v. Lansing,* 22 N. Y., 520; Story on Agency, §§ 210, 211, and cases cited in notes. To the point that information acquired by the agent would not impair his right to purchase, unless acquired when he owed some duty inconsistent with that right, or while he was trustee strictly so called, they cited· *Van Epps v. Van Epps,* 9 Paige, 241. 2. That the act of Harkness in taking with him as partners or associates the other four grantees, his codefendants, occurred after the contract of sale was complete in all respects, and was *executed* within the·sense of the decision in *Parker v. McKenna,* L. R., 10 Ch. App. Cas., 113, 125–6; *Silverthorn v. McKinster,* 12 Pa. St., 67; *Painter v. Henderson,* 7 id., 48; *Watson v. Sherman,* Sup. Ct. Ill., Jan. 31, 1877. The written proposition and recorded acceptance formed a complete contract, which neither party could legally withdraw from or modify of his own volition. Nor could any modification have been made by the action of Harkness and the two directors who then became associated with him, these two being a minority of the directory. Harkness could have compelled the company to clothe him or his appointees with the legal estate *(Fletcher v. Ashburner,* 1 L. C. in Eq., 775, notes on pp. 790, 801; *Craig v. Leslie,* 3 Wheat., 564, 579; *Peter v. Beverly,* 10 Pet., 534, 564; *Taylor v. Benham,* 5 How., U. S., 234, 269); and in equity, he had a plain right to sell, and the two directors an equally plain one to buy. The equitable estate held by Harkness was in no sense adverse or hostile to the legal estate, which the corporation held in

trust for him, and which he had a right to call upon it to convey on payment of the purchase money. In these important respects the case is clearly distinguishable from *Parker v. McKenna*, and is identical with *Silverthorn v. McKinster* and *Watson v. Sherman*, *supra*.

RYAN, C. J. A distinction is recognized in the books between corporate officers, whose offices are of the essence of the corporation, and whose offices are merely ministerial. Courts of equity deal with the former as trustees; with the latter as agents. Angell and A. on Corp., §§ 312, 426; *Pickett v. School District*, 25 Wis., 553. The question raised by this appeal is therefore different, as to the respondents who were the directors of the corporation, and as to the respondent who was its superintendent.

I. The general rule applicable to the directors, regarded in the light of trustees, was settled in the case of *The Taylor Orphan Asylum*, 36 Wis., 534. The court adheres to the rule of that case.

"Since the leading case of *Fox v. Mackreth*, 2 Cox, 320, and 2 Brown's C. C., 400, decided in 1788, the rule which governs this case has been growing in stringency. For a time, it was confined to cases of undue advantage. Then it rested upon presumption of undue advantage, unless the trustee purchasing could make it appear affirmatively that he had acted throughout *uberrima fide:* a mitigation of the present rule still sometimes admitted. But we take the rule to be now very generally settled in this country, as it is well stated by WALWORTH, Ch., in *Torrey v. Bank of Orleans*, 9 Paige, 649: 'It is a settled principle of equity, that no person who is placed in a situation of trust or confidence to the subject of the sale, can be a purchaser of the property on his own account. The principle is not confined to a particular class of persons, such as guardians, trustees or solicitors, but is a rule of universal application to all persons coming within its principle, which

is, that no party can be admitted to purchase an interest, where he has a duty to perform that is inconsistent with the character of purchaser.' Or, as it was stated by PAINE, J., in this court: 'The rule is well settled that trustees are not permitted to purchase the trust property; not because they might not, in many instances, make fair and honest disposition of it to themselves, but because the probability is so great that they would frequently do otherwise, without danger of detection, that the law considers it better policy to prohibit such purchases entirely, than to assume them to be valid except where they can be proved to be fraudulent.' *Gillett v. Gillett*, 9 Wis., 194."

In the case now before the court, the conveyance of the corporate property by the corporation was to the two directors and the superintendent. But it appears that the conveyance was made in compliance with an agreement to sell to the superintendent alone, made before the directors had entered into any engagement to join him in the purchase. And it is therefore argued that, assuming the validity of the superintendent's purchase, the directors are to be taken as purchasers from him, not from the corporation; that the conveyance relates back to the time of the superintendent's purchase, and that, at the time of the conveyance to them, the directors were charged with a mere ministerial duty to execute it, and discharged from all trust for the corporation in the care and disposition of the property conveyed.

A trustee is not barred from ever becoming a purchaser of what had once been part of the trust estate. When the title of the trust estate has passed by valid sale, in which the trustee has no interest, and all interest of the *cestui que trust* in it has ceased, the trustee becomes a stranger to the property, and may purchase it like any other stranger. But where the trustee's sale to a stranger is colorable only, and made in whole or in part for the use of the trustee, or upon any understanding, express or implied, between the trustee and the

purchaser, for any future interest of the trustee in the purchase or in the trust property purchased, a court of equity will deal with the trustee as a direct purchaser from himself, and will avoid his purchase at the suit of his *cestui que trust*. And where the trustee, having ostensibly conveyed to a stranger, suddenly becomes interested with his own grantee, a court of equity will regard the transaction with great jealousy and avoid it in favor of the *cestui que trust*, upon slight evidence of collusion in the trustee's sale, between the trustee and the purchaser; *a multo fortiori*, when the trustee becomes interested in the purchase while the sale remains *in fieri*.

But the counsel of the respondents contend, as already stated, that when the conveyance in this case was made the transaction was not really *in fieri;* that the sale was virtually complete by the executory contract; that the contract operated to vest the equitable estate in the superintendent, and to divest the corporation of beneficial interest, leaving in it the mere legal title for the use of the purchaser, absolutely subject to present conveyance; that the duty of the directors to convey was merely ministerial in character, involving no control over any interest of the corporation; and that therefore the directors could properly purchase from the superintendent, and officially direct the execution of a conveyance by the corporation to the superintendent and themselves. And the learned counsel cited authorities sustaining the principle on which the proposition rests. *Parker v. McKenna*, L. R., 10 Ch. App., 96; *Silverthorn v. McKinster*, 12 Pa. St., 67.

This is treading upon dangerous ground. Such a rule may be comparatively safe when, as in *Silverthorn v. McKinster*, there is an interval of years between the purchase from the trustee and the purchase by the trustee, with no appearance of interest of the trustee in the mean time. But when the trustee's purchase from his grantee follows closely on the executory sale of the trust estate, almost contemporaneously as in this case, such a rule might well operate to protect collusive

sales of trustees to third persons for their own benefit. This court would be disposed to adopt such a rule with great reluctance; or, adopting it, to administer it with apprehensive and jealous caution. It is strictly in violation of the general rule that one charged with a trust cannot be both vendor and purchaser; that a trustee cannot purchase from his *cestui que trust.* Such a transaction is essentially suspicious; essentially dangerous.

But it is unnecessary to determine here whether and how far this court would be willing to adopt the exception suggested to the general rule. The exceptional rule is well stated in *Parker v. McKenna, supra,* by MELLISH, L. J. "The main question appears to me to depend upon this — how far a trustee or agent for sale is precluded from purchasing from his own purchaser the property which he is entrusted to sell. In my opinion, as long as the contract remains executory, and the trustee or agent has power either to enforce it or to rescind or alter it, as long as it remains in that state, he cannot re-purchase the property from his own purchaser, except for the benefit of his principal. It appears to me that that necessarily follows from the established rule that he cannot purchase the property on his own account. There may, of course, be cases of agents for sale who when they have once made the contract have concluded their agency, such as the case of an auctioneer — when he has knocked the estate down and made the written contract, it may be said that his agency has terminated. I should suppose that even in that case the court would look with considerable suspicion on a re-purchase by such an agent as an auctioneer from the person to whom he sold the estate, because it would always be extremely difficult to find out whether there had not been some previous concert and understanding between them. But that is not the case before us. In the case before us it is quite clear that up to the time when the shares were actually registered in the names of *bona fide* purchasers from Stock, the directors had full

power on behalf of the company either to·enforce the contract against Stock, or to decline to enforce it, or they had power to modify it."

In that case, in the absence of all positive fraud, the purchase by directors from one holding upon an executory contract of the corporation was held voidable, and the profits of resale by the directors decreed to be held by them in trust for the corporation.

In this case, when the directors joined the superintendent in his purchase, the contract remained executory; and the board of directors had power, indeed were charged with duty, on behalf of the corporation, in proper circumstances, to enforce the contract against the superintendent, or to decline to enforce it, or to alter it, or to rescind it, as might be for the interest of the corporation. It will not do to say that there was in fact no controversy, no question of enforcing or altering or rescinding the contract. There might have been. The reports abound in controversies arising upon such executory contracts. And the principle is independent of the fact, as shown by *Parker v. McKenna*. It is because such questions might arise, not because they do arise, that the rule is so cautiously guarded; dangerous as it is with all caution. Indeed the fact that a trustee is interested with the purchaser has the double tendency of preventing the trustee from raising questions for the interest of the *cestui que trust*, and of leading him to yield to questions raised by the purchaser against the interest of the *cestui que trust*. Questions were quite possible upon the construction or effect of` the executory contract here. The superintendent might have repented of his bargain, and declined to execute it. . Indeed, there is evidence tending to suggest that he might very possibly have done so, if the directors had not joined in his purchase. Such a suit as this might have been brought, before the conveyance, to avoid the executory contract on the ground of the superintendent's incapacity to purchase; or a suit founded on that ground

and inadequacy of price, and tendering a higher price. In such contingencies and many others, the interest of the directors who became purchasers would be directly in conflict with their duty as directors.

The rule of the English court in *Parker v. McKenna* could not take the respondent directors out of the rule of this court in *Re Taylor Orphan Asylum.* Conceding the validity of the superintendent's purchase, their duty to the corporation precluded them from participating in it. And the conveyance to them is voidable at the suit of their *cestui que trusts.*

II. Agents may be *quasi* trustees to bring them within the broad rule applicable to trustees generally, that they cannot become purchasers from their principals. But an agent generally comes within this rule, only when his agency is so connected with the sale as to make it his duty to obtain the best terms for his principal; when he cannot be agent to sell and principal to buy. That was not the character of the superintendent's agency for the corporation here. He had no power to sell, no agency connected with a sale.

But whatever may be the nature of the agency, a court of equity regards every purchase by an agent from his principal with jealous scrutiny, to see that the agent takes no advantage from the confidence of his principal: with jealousy almost invincible, as Judge Story calls it. And there is a class of agents who are held to a very strict rule, a good deal like the rule which courts of equity once generally applied to trustees, and some few courts still apply. When the nature of the agency has given the agent control in the management of the principal's property, and peculiar opportunity of knowing its condition and value, a purchase of it by the agent will be avoided at the suit of the principal unless the agent make it affirmatively appear that the transaction was fair, and that he imparted to the principal all his information concerning the property, and acted throughout *uberrima fide.* In such a case the principal is not called upon to impeach the conduct of the

agent or the fairness of the transaction. The *onus* is upon the agent to show that he had advised his principal of all things, within his knowledge, going to the value of the property, as fully as he should have done if the principal were dealing with a stranger for the sale of the property: "had given all the advice against himself that he would against another." *Dunbar v. Tredennick*, 2 Ball & B., 304; *Selsey v. Rhoades*, 2 Sim. & Stu., 41; *S. C.*, 1 Bligh, 1; *Molony v. Kernan*, 2 Drury & War., 31; Story's Eq., § 315, and cases cited in note, § 316 a. This is but an application of the general rule of *uberrima fides*, required in dealings of parent with child, guardian with ward, attorney with client, and persons generally standing in a relation of confidence and influence with those affected by the relation. Indeed, it has been doubted whether equity should support, under any circumstances, the purchase of such an agent, from his principal. *Norris v. Le Neve*, 2 Atkyns, 26; *Dunbar v. Tredennick*, *supra*. It may be regretted, though too late, that such purchases can ever be upheld.

The superintendent appears to have occupied such a confidential position under the corporation. He appears to have had the principal charge of the general business of the corporation; apparently of all its business, possibly with exceptions not material here. The prosperity of the corporation was thus largely dependent upon him. He appears to have been in charge of the books, accounts, vouchers, papers, etc., of the corporation. He thus had peculiar opportunity of intimate and accurate knowledge of its affairs; perhaps better than the other officers, certainly better than stockholders not officers. He must be presumed to have been intimately and accurately acquainted with the financial condition and prospects of the corporation; perhaps better than the other officers, certainly better than stockholders not officers. He stood towards the corporation in very much the same relation as the agents and stewards of the English cases towards their principals.

Such an agent, contemplating a purchase of the subject of his agency, has dangerous power to confuse its condition and make it appear worth less than it is. Such an agent might well be tempted, would generally have some power, so to shape his agency as not only to depreciate in apparent value, but temporarily in real value, what he designs to purchase. This is not said by way of comment on the facts here. There is nothing in the record to raise any presumption of such fraud against the superintendent. It is said by way of illustrating the justice and wisdom of the rule applicable to purchases by such agents generally. And the respondents, to support the purchase of the superintendent, took upon them the *onus probandi* that he had not abused his power; that he practiced throughout positive and explicit frankness and impartiality; had imparted to his principals all his own information bearing on the value of the property; had given all the advice against himself that he should have given against a stranger; had derived no advantage from his agency, but had acted openly throughout, *uberrima fide*.

The record has been searched in vain for such proof. It does not appear that the superintendent made any statement on the subject to the board of directors. Indeed, it may be doubtful, in the peculiar circumstances of this case, what weight could be given, as against stockholders, to any statement to the board. The superintendent addressed the meeting of stockholders held in view of selling. That was his opportunity, which he does not appear to have taken. There is no testimony that he made a general statement of the affairs or condition of the corporation. The testimony of Joslyn, Peck, Carhart, and Harkness himself, goes to show that what he did say on the subject was just such depreciation of the value of the property as might be expected from a stranger bargaining for its purchase. He appears to have been before the meeting, not as superintendent of the corporation, but as purchaser expectant of its property. Evidently he either did

not know his duty, or saw fit not to perform it. The only circumstance noticed in the record tending to show any consciousness of such a duty of the superintendent, is his dismissal from office pending the transaction. This has a little the look of somebody's perceiving that the superintendent owed such a duty, and had failed to perform it; a little the look of an attempt to evade the consequence.

For these reasons, the executory contract of sale to the superintendent is voidable in like manner, though on a different rule, as the conveyance to the directors and himself.

This view makes it unnecessary to consider what might be the effect upon the executory contract of sale to the superintendent, if that had been valid against the corporation, of his associating the directors with himself as purchasers before the contract was executed.

III. One of the learned counsel of the respondents claimed that the whole transaction, if voidable, had been affirmed at a meeting of the stockholders pending this suit. It appears that the superintendent offered to reconvey to the corporation; whether upon condition or not, the testimony leaves in doubt. The stockholders did nothing towards accepting the proposition. And this failure was urged as an act of ratification. The court cannot so regard it; and need not consider how far such a ratification *pedente lite*, not pleaded, could affect the appellant. So far as the appellant is concerned, he disaffirmed the transaction by promptly bringing this suit.

IV. The right of action in such a case as this is primarily in the corporation itself; but every stockholder takes the right, in lieu of the corporation, upon refusal of the governing body; as was the case here. *Dousman v. Mining Co.*, 40 Wis., 418, and authorities cited for the appellant in that case. Courts of equity have long recognized this right of self-protection in stockholders; and the administration of many corporations in these days tends to show the wisdom and justice of the rule. Late reports abound in cases turning upon corporate mal-

administration. The interest of a stockholder is not abso-. lutely at the mercy of the governing body. Stockholders may have rights which boards of directors cannot destroy.

Nothing said is intended to impute positive fraud to the respondents. Except so far as the reserve of the superintendent may possibly be so regarded, no positive fraud is imputed by any of the evidence to any of the respondents. Like the decree in *Parker v. McKenna*, the judgment in this case is rested on the doctrine of constructive fraud only; reluctantly applied under the circumstances.

Many things in the record tend to support the statement of one of the respondent's counsel, that all or most of the gentlemen chiefly interested in promoting the corporation and its operations, acted throughout as well for the interest of their city as for personal profit; and that the interest of the city in the continuance of the enterprise entered largely into the sale and the reorganization of the business. Many things in the record prepared the court to accept the statement of counsel, that the directors are persons of high respectability. Such regards, however, should only add to the weight of a judgment applying the rule, uninfluenced by color of positive fraud. The rule forbidding conflict between interest and duty is no respecter of persons. It imputes constructive fraud, be-cause the temptation to actual fraud, and the facility of concealing it, are so great. And it imputes it to all alike, who come within its scope, however much or however little open to suspicion of actual fraud. Equity "does not so much consider the bearing or hardship of its doctrine upon particular cases, as it does the importance of preventing a general public mischief, which may be brought about by means, secret and inaccessible to judicial scrutiny, from the dangerous influences arising from the confidential relation of the parties." "The principle applies, however innocent the purchase may be in a given case." If this court should relax the rule in view of particular circumstances suggested or appearing here, the

judgment would surely be a pregnant source of what Judge Story not inaptly calls poisonous consequences. Story's Eq., §§ 310, 322; *Greenfield's Est.*, 14 Pa. St., 489.

. *By the Court.* — The judgment is reversed, and the cause remanded to the court below for judgment for the appellant in accordance with this opinion.