## W. A. NABOURS ET AL. V. A. P. McCORD ET AL.

### Decided June 3, 1903.

**1.—Trust—Assignee Acquiring Title Through His Own Sale—Charge.**

In a suit by accepting creditors to set aside a sale of property of an insolvent by his assignee who had acquired title thereunder, it was error to charge that such sale was valid if the purchaser had not bound himself to let the assignee take the property at the amount of his bid, but had merely purchased under a guaranty, made by such trustee in good faith and for the purpose of having the whole property bring a fair price, to take a part of the same off his hands. (Key, J., dissenting.)

**2.—Same.**

It was error and a charge on the effect of evidence to single out one circumstance in the transaction and instruct as to its legal effect instead of leaving it to be considered, in connection with all the other facts, on the issue as to the motives actuating the trustee in making the sale.

**3.—Trustee Purchasing at His Own Sale.**

The purchase by a trustee, indirectly, at his own sale condemned and such case distingished from those of public sales by order of court and subject to its confirmation, and from those of purchasers by a trustee from the beneficiary or by a beneficiary from the trustee.

**4.—Same—Sale on Credit—Guaranty by Trustee—Executory Contract.**

Where the sale by a trustee was on credit, retaining title and possession till payment, it was merely executory; and an agreement by the trustee to take certain property from the purchaser at his bid, under which such trustee advanced the purchase price and conveyed and delivered the property to a third party for his own benefit, was indirectly a sale to himself, and voidable at the election of the beneficiaries of the trust, irrespective of good faith.

Error from the District Court of Milam. Tried below before Hon. J. C. Scott.

Justice Streetman being disqualified to sit in this case, T. B. Cochran, Esq., was appointed and qualified as Special Associate Justice.

*D. W. Doom, W. K. Homan, Hefley, McBride & Watson,* and *Etheridge & Baker,* for plaintiffs in error.

*Ford & Chambers, J. M. Ralston, T. S. Henderson, M. J. Moore, Crane, Green & Wharton,* and *N. H. Tracey,* for defendants in error.

COCHRAN, SPECIAL ASSOCIATE JUSTICE.—The plaintiffs in error, Nabours and others, brought this suit for their own use and for the use of all other accepting creditors of W. F. and F. M. Crawford under a deed of assignment made to defendants McCord and Henderson as assignees, naming as defendants the assignees and their bondsmen and the Milam County Oil Mill Company. At the trial the plaintiffs dismissed their suit as against the defendants Henderson and the bondsmen, and upon the verdict of a jury for the remaining defendants, judgment was accordingly entered, from which the plaintiffs have sued out this writ of error. The suit as against McCord is predicated upon the charge of breach of duty on his part in negotiating and making a pretended sale of part of the assigned estate to a third party under circumstances con-

templating a retransfer to him followed by such transfer and subsequent appropriation of the property to his own use.

The property which it is alleged that McCord thus acquired consisted of stock in the defendant oil mill of the par value of $24,200, an undivided interest of 1300 acres of land in Jefferson County, a like interest of 1000 acres in Milam County and a one-half interest in five notes of the face value of $5743.75 secured by a vendor's lien on 510 acres of land in Milam County.

The Oil Mill was made defendant for the purpose of protecting the rights of creditors in the above stock pending this suit as to the payment of dividends and otherwise.

The plaintiffs in error seek a reversal of the judgment upon three grounds, viz: (1) error in the court's charge as given; (2) error in refusing a special charge asked; and, (3) error in refusing to set aside the verdict on motion for a new trial because contrary to the evidence.

It is sufficient for the purposes of this opinion to find the facts of the case as shown by the record to be:

1. W. F. Crawford and F. M. Crawford, bankers at Cameron, Texas, under the firm name of "Milam County Bank," failed in business March 16, 1896, owing debts secured to the amount of $45,190.97, and unsecured in the sum of $79,619.40. On that day they executed a statutory deed of assignment naming McCord and Henderson as assignees, who qualified on the following day and proceeded with the administration of the trust until they filed their final report on June 23, 1900.

2. This report shows that the remnant of the estate consisting of the property sued for and other lands and chattels was sold to C. W. Lawrence on May 5, 1897, for the sum of $22,500. That the total receipts were $90,271.21, a large part of which was used in redeeming such of the assets held in pledge as were thought to be to the interest of the estate, and the balance, after paying expenses, was sufficient to pay five dividends aggregating forty and 82-100 per cent to the unsecured creditors who had filed claims amounting to $76,624.22 leaving unpaid practically 59 per cent of these claims or more than $45,000.

3. The plaintiffs were among those accepted under the deed of assignment, filed their claims duly verified as required by law, and have rights entitling them to prosecute this suit.

4. The facts connected with the sale to Lawrence as disclosed by the testimony of himself and Ralston and other witnesses for the defendants, are as follows: Lawrence and one Sprinkle had for some time been considering the joint purchase of the remnant of the assets after the assignees had indicated a desire to close the administration by sale in bulk, if necessary, and had made a list of what remained and attached a value or selling price to certain articles, among which was the property in controversy. Ralston and his law partner were employed by these parties under an agreement that Lawrence and Sprinkle should furnish the money to make the purchase and the lawyers were to assist

in making collections and sales, and the net profits, after repaying the money advanced and interest, were to be equally divided.

Mr. Henderson, as one of the assignees, appears to have been anxious to close out the assets, and received a bid of about $20,500 for the remnant from one Hefley. Notice of this reached Lawrence and Ralston and they began to consider what amount they would offer. There is no evidence that the bid made by Hefley was his final offer, and it is shown that as soon as he heard of the deal with Lawrence for $22,500 he offered him $2000 for his bargain.

Lawrence did not want to buy the oil mill stock and the other property sued for to which values were affixed in the list, and objected particularly to the stock. Ralston, who lived with McCord and was related to him, told him of Lawrence's objections, to which McCord replied, as shown by Ralston's testimony, "The oil mill stock is worth that much money ($8000) and ought to sell for that much money, and if he makes a proper bid and gets the oil mill stock and wants to sell it for that amount I can get him a purchaser for it at that."

Ralston states that in talking with Lawrence the next day he stated to him "that we need not be afraid of not being able to turn the oil mill stock if we wanted to at that price; that, if we bought it, a party told me that he would have a purchaser for it at that price if he [we] wanted to sell it." Ralston did not tell Lawrence who made the statement, and the only inquiry made by Lawrence was, if the party was responsible and could be relied on. He then raised objections to the other properties sued for. This was also reported to McCord by Ralston. The same assurances being given and reported back to Lawrence, he concluded that he would be safe in making an offer of $22,500 for the remaining assets, provided he could get terms. The record does not show what terms were asked but the contract as closed resulted in the assignees giving him until June 1 to pay $8500 and until October 15 to pay the remaining $14,000, they to retain possession of everything and to surrender the different items to him as he was able to realize upon them and pay their list value.

A written proposition was then drawn to the above effect and carried by Lawrence to Henderson, who objected to signing an acceptance of it until he could consult with McCord. Being assured by Lawrence that if it was not satisfactory to McCord the trade would not be closed, Henderson signed the paper and it was subsequently signed by McCord, but the date of his doing so is not shown.

While Lawrence, in giving his views as to the effect of what occurred in connection with the contract, states that he did not know who the party was that gave the assurance or guaranty of a purchaser to Ralston, and that there was no contract or agreement expressed or implied that he was buying for McCord or was to retransfer any part of the property to him, he nevertheless says, "but for the guaranty he would not have bought" the stock and other property sued for; that he made

the inquiry as to the responsibility of the party because he "felt or expected that he would sell that stuff to that man" and wanted to know if he was able to carry out his contract; that he did not want to handle this part of the property because he did not think there was anything in it; that after the contract was closed he paid but little attention to these items of property because he expected, in pursuance of that guaranty, for them to be taken off his hands.

This witness further states that "after the trade was closed I saw Mr. Ralston about his land and I insisted on it being closed up; these were matters that I thought were important and should be closed up."

Lawrence testifies, that when he made the proposition to buy Sprinkle was interested with him; that he went to Sprinkle, told him there was not enough in the trade for three, and offered to withdraw in his favor, but that Sprinkle declined the offer and withdrew from the transaction.

5. The record shows that after signing the contract of sale and while the mill stock still remained in the possession of the assignees, McCord borrowed $8000 from one Flato, in Kansas City, with which to pay for this stock, agreeing to hypothecate the same as security, and that on May 27, the stock still remaining with the assignees, Lawrence by Ralston's direction indorsed the certificates to Flato, and his check to McCord for $8000 was used to pay for the stock, Lawrence testifying that this was the only time he ever had his hands upon this stock. He also testifies that he never had possession of the Steele notes sued for, and having directed Ralston to call on the "guarantor" he paid very little attention to what became of these items and only signed such transfers as Ralston prepared.

Ralston testifies that on May 20 he called upon McCord to produce a purchaser for the mill stock and this he said he would do and on the 27th directed it to be indorsed to Flato and when he asked him who the lands should be sold to, he said "he didn't know yet but that he would be responsible for it, considered it was sold to him."

It appears that McCord in this way became responsible for and paid to himself $8000 for the mill stock and $2500 for the other properties, but as to how and when this last payment was made is not shown.

6. The record shows that McCord and Henderson, as assignees, executed a deed conveying to Lawrence seven different parcels of land, among them the two tracts involved in this suit. This deed bears date, May 5, 1897, was acknowledged May 7, 1897, and filed for record August 3, 1897, but it is not shown when it was in fact delivered to Lawrence. The consideration recited in the two notes of Lawrence for $8500 due June 1, 1897, and $14,000 due October 15, 1897, and the instrument expressly retains the vendor's lien on all of the lands conveyed except the two tracts here sued for, on which tracts the vendor's lien was expressly waived.

The Steele notes were conveyed by a separate instrument, dated May 10, 1897, but not acknowledged until March 15, 1898. As to when this

document was written and delivered, the record is silent. It appears, however, that Steele, on January 4, 1898, conveyed the land, one-half to McCord in satisfaction of his interest in the notes.

The record shows a deed from Lawrence to McCord conveying the Jefferson County land, dated May 31, 1898, and a conveyance of the same land by McCord to another party, dated September 19, 1898, for the sum of $2166 paid, of which McCord received net $2000. The title to the other tract of land remained in the name of Lawrence until November 22, 1898, when he executed a deed conveying the same to F. J. and W. R. Fitzwilliam, the only consideration recited being the settlement of the note for $10,000 given by F. M. to W. F. Crawford and which was secured by vendor's lien on the land.

7. We find that when the contract of sale was made with Lawrence, a separate bidder for the interest of 1000 acres in Milam County had indicated to McCord a willingness to take this property at the price asked for it. That this occurred on April 30, 1897, and this party had returned to his home to arrange for the purchase money, and after so arranging for about one-half of the agreed price he heard that the land had been sold. We also find that Flato had indicated a disposition to buy the oil mill stock at one-third of its face value. The record does not show that these items of property had any connection with each other, or with the balance of the estate, so as to require that all should be sold together; and we therefore find that the giving of the guaranty or assurance by McCord was not necessary under the circumstances to secure a bidder for these properties, since there was no time fixed or required within which the sale should be made.

8. While the record discloses by the direct testimony of W. F. Crawford, an agreement entered into between him and McCord prior to the sale to acquire the property sued for through Lawrence in the manner it was, and a corroboration of this witness by the declaration of McCord to Ralston after the sale that Crawford was interested with him in the lands, and other facts and circumstances in support of this contention, we have not thought it necessary to refer to this branch of the case, preferring to make our findings upon the undisputed facts and the testimony of Ralston and Lawrence and other witnesses produced by the defendant.

We feel called upon to remark that defendant McCord did not testify at the trial and the record offers no explanation for his failure so to do.

*Conclusions of Law.*—The charge complained of, and in giving which, we think there was error, was as follows: "Although an assignee would have no right to make an agreement with a proposed purchaser of the property of an assigned estate by which the purchaser was bound to sell to such assignee any portion of the property after his purchase, yet such assignee in order to procure an advantageous sale of the property would have the right to guarantee to such prospective purchaser a sale of cer-

tain of such assets at a designated price. So if you believe from the evidence that the defendant McCord, in good faith, for the purpose of having the property bring a fair price, and not with a view to his own benefit as purchaser thereof, but as an inducement to Lawrence to buy the property at a fair price, caused the statement to be made to Lawrence that a purchaser would be furnished who would take the property off his hands, should he wish to sell it, at the price Lawrence gave for it, then said statement would not vitiate the sale, provided Lawrence was under no promise, express or implied, to allow McCord to take the benefit of his purchase; and if you believe that Lawrence purchased said property under said circumstances, and afterwards in pursuance of said statement sold a portion of said property to said McCord, said sale to Lawrence and by him to McCord would be valid and you will find for defendants."

This charge should not have been given, because in our opinion it was a charge upon evidence and an instruction as to the legal effect of one circumstance in the transaction which should have been left to the jury in connection with all other facts and circumstances in the case, on the issue as to whether McCord in making the contract to sell was actuated by motives of self-interest and a desire to acquire trust property indirectly through Lawrence. Occupying a position of trust for the benefit of creditors, who had no voice in his selection or appointment, and invested with a very broad discretion under the law, McCord should be held to the use of the most jealous care for the interests of those whom it was his duty to serve, and can not be permitted to have a personal interest in opposition thereto. 2 Pomeroy's Equity, sec. 1077.

When a trustee is found with trust property in his hands which he is charged to have sold in breach of his duty, and to have repurchased for himself, the burden of showing the fairness and regularity of his conduct is upon him, and if wrongful the fact that his vendee may have been innocent of the fraud and had no conscious participation in it will not protect him. Ellis v. Singleton, 45 Texas, 41; Everett v. Henry, 67 Texas, 404; Perry on Trusts, secs. 222 and 830.

It is the fraud or wrongdoing of the trustee which gives a right of action to those for whom he is acting, and the concurrence or participation of a third party is not an essential feature in it. McCord was a trustee to sell the trust property to the best advantage. This the law says, can only be done when he has no self-interest to promote. A direct sale to himself is a patent fraud and is easy of solution. When the sale is indirect, while it may be and usually is difficult to bring the case clearly within fixed rules and say that this or that state of facts establishes an indirect sale, the principles of law which govern the one case are the same as in the other.

The law is well settled that when a trustee is charged with becoming the purchaser at his own sale he can not defend on the ground of his own good faith by showing that he was paid full value for the property

and that in the particular case no injury has resulted. McLaury v. Miller, 64 Texas, 382; Perry on Trusts, sec. 197.

While the charge of the court in the main recognizes these principles, the paragraph complained of makes the case turn on a sale to Lawrence and a promise, express or implied, on his part to reconvey to McCord, and states that the giving of a guaranty in order to obtain a fair price would be legal even if the property was subsequently reconveyed to McCord in pursuance of the agreement by which the guaranty was given.

If the good faith of a purchase by a trustee at his own sale and the payment of full value is no defense in one case we fail to see that good faith through a guaranty resulting in the acquisition of the property by the trustee can change the rule. The giving of the guaranty may have been in the utmost good faith so far as getting Lawrence to pay a fair price for the property is concerned, yet it may be a means, and perhaps have been the only means, by which the trustee could hope to acquire the property.

The case at bar may serve as an illustration. The mill stock may have had an intrinsic value above the $8000 asked for it and the trustee alone have known this, or it may have had a value to him in controlling the management of the corporation, or otherwise. Lawrence wants to buy the other property but does not want this stock and no one but the trustee may want it. While Lawrence is hesitating about making an offer the trustee causes the assurance or guaranty of a purchaser to be communicated. No promise to hold the stock for him is asked. Indeed, why should there be when the trustee in fixing the time of payment requires that a sum about equal to the price of this stock shall be paid in less than thirty days and knows that the purchaser expects to pay by converting the assets into money; what could be more certain than that he would be called upon to produce a purchaser—"make his guaranty good"—and thus by necessary sequence he becomes the purchaser. The good faith as to making the stock bring the price asked is perfect but the giving of the guaranty becomes the direct means of acquiring the property.

The charge would require that the purchaser should be under promise to reconvey to the trustee as a condition necessary to render the sale invalid. This rule might apply if the suit was against the purchaser. But if the purpose or intent of the trustee in making the sale was to wrong the beneficiaries by becoming the owner of the trust property through Lawrence, by means of the guaranty, and the trustee does become the owner, the trust in the property is revived. The wrong need not be attended with pecuniary loss to the beneficiary or personal gain to the trustee. It consists in doing what the law says he can not do.

The vice in the transaction, if any there be, must depend upon motives of self-interest actuating the trustee in making the contract of sale, and if there is to be any fixed rule of law applicable to the giving of a guaranty to the purchaser by a trustee in making a sale, followed

by a repurchase of the property by the trustee, it should be a rule of censure and not of encouragement, because of the danger of abuse by the trustee of his discretion in choosing the time and terms of sale and the person to be favored by his guaranty.

We need not go to the extent of holding that a guaranty against loss given by the trustee to the intending purchaser would, in a given case, per se, invalidate the sale. What we do hold is, that it is at most but a circumstance, proper to be considered as evidence in connection with all other facts and circumstances connected with the transaction. Its probative force must be left to the jury, for while it may, under the circumstances of one case, have little or no bearing in proof of the charge that the trustee became the purchaser indirectly at his own sale, it may under other circumstances and surroundings be a circumstance cogent and convincing that the guaranty was but an artifice or indirect means by which the trustee becomes invested with trust property.

Counsel for defendant in error rely upon the case of Ives v. Ashley, 97 Mass., 298, as sustaining the charge of the court. We have carefully considered the opinion in that case and are not inclined to follow it, or hold it applicable to the facts of this case. The question before the court was as to the effect of a guaranty given by an administrator prior to a sale made by him at public auction. We must assume that such a sale was made by order of court and subject to its approval. While it may be safe to permit an administrator to become the purchaser of property thus sold by him at public sale, through his personal guaranty to the purchaser, the powers of an assignee in making a sale under our assignment laws, when the sale is made privately and he may choose the time to sell, the person to buy, and fix the terms of sale at his own discretion, are so entirely different from a public sale ordered and approved by the court, that we are unwilling to open the door to possible fraud by announcing as a fixed rule that a guaranty followed by a trustee's purchase would be valid as a matter of law. The exception to the general rule announced by some courts which permits a trustee under some circumstances to become interested in the purchase of trust property, rests upon the fact that it is made under the control of a court or its officers, and is therefore public and free from suspicion or opportunity for fraud by the trustee. 27 Am. and Eng. Enc. of Law, 210. This exception is not a settled rule and courts of the highest authority deny its application. Davoue v. Fanning, 2 Johns. Ch., 252, and cases cited.

Fraud and wrongdoing by persons occupying positions of trust and confidence have always been the subject of the most jealous care on the part of courts of equity, and where the sale has been made indirectly to the trustee it would be difficult, if not impossible, to lay down a rule which would apply to each case; and when the transaction is to be reviewed by a jury under a charge from the court, where there is no fixed rule applicable to the particular facts, a charge which assumes that one

fact or state of facts would constitute fraud and invalidate the sale, or would not do so and that the sale is valid, invades the province of the jury and would be a charge upon the weight of evidence.

The law seeks to remove all temptation from the trustee and often disapproves of his acts, performed in apparent good faith, because of the danger of collusion, and to avoid inquiry into the intricacies of his motives and conduct, in which evil would often escape detection and the truth be discovered, if at all, at great disadvantage.

Holding as we do that the giving of the guaranty was not a proper subject to be singled out and charged upon by the court, disposes of the error claimed as to the refusal of a special charge upon the same subject asked by the plaintiffs, presenting what we would otherwise hold to be a correct proposition of law.

In view of another trial, it is our opinion that the evidence raises the question of executory or executed contract of sale, and that the court erred in treating the transaction with Lawrence as a sale.

The rule seems to be well settled that while a trustee may buy property, which he has once fairly sold in his fiduciary relation, after the sale has been completed and the title vested in the purchaser, yet if only a contract for the sale of the property has been entered into, and the transaction remains in fieri and the title has not finally vested in the purchaser, his relation to the property as trustee his not ceased, and the same disqualification to buy or acquire an interest in the property exists in such case as in a purchase from himself in the first instance. Cook v. Berlin Woolen Mill Co., 43 Wis., 433.

The reason for the rule seems to be, that, if the contracting purchaser becomes dissatisfied with his trade or be unable to carry it out, and there should exist any reason why the trustee should want to possess himself of the property, he should be required to give the cestui que trust the benefit of it and cancel the trade, instead of purchasing for his own interest. This rule applies with special force to the mill stock and to the Steele notes converted by McCord into the land for which they were given, for the reason that it appears from the evidence that the only right which Lawrence ever had in these properties was based upon his contract of purchase, and that the title to these had not become vested in him prior to the time that McCord was called upon to take them under his assurance of purchaser or guaranty against loss.

In addition to the authorities cited, it occurs to us that the right which the creditors had to object to the sale to Lawrence because made on credit or for other reasons, and to have brought suit to compel a sale for cash or to set it aside for any other reason, so long as it remained executory, as held in Keller v. Smalley, 63 Texas, 516, and Moody v. Carroll, 71 Texas, 146, furnishes a further reason why McCord could not lawfully acquire the rights of Lawrence' whatever they may have been under the contract. To permit him to do so, would place him in the attitude of having a personal interest to enforce the contract, and

the duty as trustee to resist it. The inconsistency of permitting a trustee to thus place himself is apparent.

While counsel have urged with much force that the case should be reversed on the facts, we have not thought it necessary to indicate our opinion on this point. The judgment will be reversed for error in the charge of the court and remanded for further proceedings in accordance with the views of the law herein expressed and it is so ordered.

*Reversed and remanded.*

[NOTE.—Justice Key concurred in reversal, on the ground that the sale was to be regarded as executory till consummated by payment and delivery; but dissented as to the part of the opinion holding the charge to be erroneous, and filed a dissenting opinion. Chief Justice Fisher, concurring, also filed a separate opinion. Upon certificate of dissent the case was carried to the Supreme Court. Pending decision upon this certificate, defendants in error filed application in the Supreme Court for writ of error, which was dismissed, with written opinion. McCord v. Nabours, 97 Texas, 271. The decision on certificate of dissent was rendered May 4, 1904. Nabours v. McCord, 97 Texas, 528.

Upon return of this opinion to the Court of Civil Appeals, plaintiffs in error moved to reverse and render judgment in their favor in accordance with the views therein expressed. This motion was denied in an opinion by Associate Justice Eidson, filed July 7, 1904. Chief Justice Fisher filed a dissenting opinion, July 12, 1904, and Associate Justice Key an additional and concurring one, July 30, 1904. Of the opinions in the Court of Civil Appeals, only that of Justice Cochran, above published, was designated to be officially published by the Reporter.]