RICHARD H. JONES *vs.* DORILUS MORRISON and others.

September 29, 1883.

**Corporation—Suit by Stockholder for Relief against Frauds of Directors—What Matters may be joined in Complaint.** — Where a complaint alleges a conspiracy to cheat and defraud plaintiff in respect to his interests as a stockholder in a corporation, all separate acts or transactions of defendants done pursuant to it may be joined in the complaint, although some of them do not affect all the defendants, and none of them affect any two of the defendants to the same extent or degree.

**Same—Stock bought with Corporate Funds, and held in Trust for Stockholders.**—Unissued stock of a corporation was, by agreement of all the stockholders, (there being no creditors,) paid for with funds of the corporation, and the stock issued to one of the stockholders to be held in trust for all the stockholders in proportion to the stock held by them. *Held,* the issue was valid, and the directors had no authority afterwards to direct the stock to be sold.

**Same—Power of Directors to pay Gratuities for past Services of Officers.**—The directors of a corporation have no authority to appropriate its funds in paying claims which the corporation is under no legal or moral obligation to pay, as to pay for past services which had been rendered and paid for at a fixed salary previously agreed on, or under a previous agreement that there should be no compensation for them.

**Same—Vote of Directors fixing Salaries of some of them as Officers.** The vote of the board of directors of a corporation, fixing the compensation of any of the directors as officers of the corporation, where it was carried by the vote of the directors whose compensation is so fixed, is *prima facie* voidable at the election of the corporation or of a stockholder.

**Same—Increase of Capital Stock—Rights of Old Stockholders in New Issue.**—Where a corporation has power to increase its capital stock, the power is held in trust for the subsisting stockholders in proportion to the original stock held by them, so that each of such stockholders has a right to an opportunity to subscribe for and take the new or increased stock, in proportion to the old stock held by him.

**Same—Vote directing Sale of New Stock.** — A vote at a stockholders' meeting directing the new stock to be sold, without giving a stockholder such opportunity, unless he consents to it, is void as to him.

Appeal by defendants from an order of the district court for Hennepin county, *Lochren*, J., presiding, overruling their separate demurrers to the complaint.

*H. J. Horn, C. K. Davis* and *Geo. B. Young*, for appellants.

*Warner & Stevens* and *Gordon E. Cole*, for respondent.

GILFILLAN, C. J. The court below overruled a demurrer by each defendant to the complaint, and from the order this appeal is taken.

The complaint sets forth that the Minneapolis Harvester Works is a corporation created as a manufacturing corporation under the act of March 7, 1873, and the acts amendatory thereof, to continue, according to its original articles, for five years from September 1, 1876, with a capital stock of $100,000, and power to increase it to $500,-000. April 30, 1878, the articles were amended so as to increase the capital stock to $150,000, with power to increase it to $500,000. September 1, 1881, by articles executed by all the stockholders and filed, the corporation was renewed for the period of 25 years, with the capital stock and power to increase as before. The business of the corporation was prosecuted at Minneapolis with such success that, on September 1, 1881, the value of its property exceeded all its liabilities by at least $450,000, or $300,000 over and above the par value of its capital stock outstanding, that sum being the amount of its accumulated profits. The capital stock—3,000 shares, at the par value of $50 per share—was then owned as follows: By the defendant Dorilus Morrison, 1,500 shares, aggregate par value, $75,000; by the defendant Clinton Morrison, 240 shares, aggregate par value, $12,000; by the plaintiff, 920 shares, aggregate par value, $46,000; and 340 shares, aggregate par value, $17,000, had been purchased by the three stockholders, paid for with the money of the corporation, and transferred to, and was then held by, Clinton Morrison, in trust for the three stockholders, in proportion to the number of shares held by them respectively. The stock continued to be so held until the acts complained of in the complaint.

The complaint alleges that the defendants Dorilus and Clinton Morrison combined, confederated, and conspired together to cheat and defraud the corporation and the plaintiff, by appropriating and converting to their several uses, so far as practicable, the accumulated.

profits, and undervaluing the property of the corporation, and increasing the capital stock and appropriating the increase among themselves to the exclusion of plaintiff, (connivance therein or knowledge thereof by each of the other individual defendants being alleged,) and that the several specific acts alleged were done in the accomplishment of such fraudulent plan. During the time when these acts were done, the plaintiff, on account of ill health, was in Europe. He had no knowledge of them till his return to Minneapolis in September, 1882, and during his absence his inquiries by mail as to the business of the corporation were answered evasively by Dorilus or Clinton Morrison, so as to furnish him no information of what was being done.

The first of them, in order of time, was the voting, by the board of directors, consisting of Dorilus Morrison, Clinton Morrison, H. G. O. Morrison, and one Richard D. Jones, at a meeting held November 19, 1881, of $7,500 per annum, from September 1, 1876, to December 1, 1881, to Dorilus Morrison, the president of the company, for the reason, as alleged in the resolution, that he had devoted much time and thought to the business from its organization, and had assumed great personal liability for the same by the indorsements of its notes, and to sustain its credit, for which he had never been paid any compensation; and also the voting, at the same meeting, to Clinton Morrison the additional sum of $2,400 per annum for his services from December 1, 1878, to December 1, 1881.

The next act was a resolution passed at a meeting of stockholders, held January 3, 1882, at which were present Dorilus Morrison, Clinton Morrison, H. G. O. Morrison, and Sabin S. Murdock, providing for an increase of the capital stock by the issue of 7,000 additional shares at $50 per share, making the whole stock $500,000, the new stock to be issued at such time and in such amounts, and upon such terms and conditions as to payments, as the board of directors might from time to time order and direct, provided that none of it should be disposed of but to holders of the old stock until after June 14, 1882, and that any such holder should have the option and privilege of subscribing to the new stock in proportion to the old stock held by him, as the new stock should be ordered to be issued, upon filing with

the president, on or before January 14, 1882, a written application, stating the number of shares he would subscribe for. At a meeting of the board of directors, held January 28, 1882, at which were present the three Morrisons and one Whitmore, then a director, a series of resolutions were passed, reciting that none of the new stock had been subscribed for; resolving that subscriptions to it be received from any person who might subscribe therefor at par, and that notes of responsible parties, bearing interest at 8 per cent. per annum, payable six months after date, approved by the board of directors, be received in payment of such new stock, the stock issued to be held as collateral security for such notes; and that the subscriptions of Dorilus Morrison for 2,920 shares, of Clinton Morrison for 1,760 shares, of Sabin S. Murdock for 1,920 shares, and of J. F. Appleby for 400 shares, be accepted, and the stock issued to them, upon their executing and delivering their notes in accordance with the resolutions of the board. At a meeting of the stockholders held on the same day, after this meeting of directors, the action of the board of directors was ratified, and the board was instructed to sell at par the 340 shares of old stock held by Clinton Morrison in trust, as above stated. The new stock was issued to the persons and in the proportions mentioned in the resolutions of January 28th, and, at a meeting of the board of directors, present the three Morrisons and Whitmore, the issue of the new stock was ratified and confirmed.

The third of these acts was that, February 3, 1882, at a meeting of the board of directors,—present, the three Morrisons and Sabin S. Murdock,—a resolution was passed fixing the salary of Dorilus Morrison, as president, for the year 1882, at $15,000; of Clinton Morrison, as vice-president, for the same period, at $10,000; of Sabin S. Murdock, as general manager, for the same period, at $10,000, —the year to commence January 1, 1882.

All these resolutions were entered on the books of the corporation.

The complaint alleges that the plaintiff alone actively conducted, managed, controlled, and built up the business of the corporation from a losing business to such a prosperous and profitable one that, when the corporation was renewed, in September, 1881, all the parties supposed and believed that, at the close of the business season of

1881, there would be a surplus capital of over $300,000; and all them foresaw that the net profit of the business for the season of 1882 would exceed $300,000, and that the net profits for that year did exceed that sum; that the services of Dorilus Morrison for the corpora- tion, prior to November 19, 1881, consisted only in attending 12 brief meetings of the stockholders, and 15 brief meetings of the directors, and indorsing with plaintiff divers notes of the corporation for its accommodation, and were not worth more than $500; and that, before the business of the corporation began, it was understood and agreed by and between said Dorilus, the plaintiff, and the corporation, that such services should be rendered gratuitously; that the services of Clinton Morrison for the corporation, from early in the year 1879 to November 19, 1881, were merely as assistant to plaintiff, at a stipulated salary paid him by the corporation.

The complaint also alleges that, after 1881, a reasonable salary for Dorilus Morrison, the president, would not exceed $1,200 per year, and for Clinton Morrison, vice-president and acting treasurer, would not exceed $5,000 per year. It also sets forth an agreement between the corporation, the stockholders and Murdock, by which, if he should elect—as the right to do was given him—to purchase at par one-fifth of the stock, his salary should be $6,000 per year; but as he never purchased, nor elected to purchase, one-fifth of the stock, it is unnecessary to consider the effect which such purchase would have had on the resolution placing his salary at $10,000 per year.

There are various other allegations in the complaint, intended to characterize the transactions, but it is unnecessary to refer at length to any of them, except the allegation made in respect to each meeting of stockholders and of the board of directors—that it was wrongful and unlawful. The meeting of stockholders of January 3, 1882, was held pursuant to a call of the president, at the written request of two stockholders; and the meeting of stockholders, January 28th, was held by adjournment of the meeting of January 3d. The meeting of the board of directors of November 19, 1881, was not a regular or stated meeting, and it is alleged to have been held without notice of any kind to plaintiff, who was one of the directors. The meeting of the board of January 28, 1882,—the meeting at which the

issue of new stock was ratified,—and also the meeting of February 3, 1882, were all held pursuant to adjournment from a meeting called by the president, and held January 25, 1882. The by-laws of the corporation provide that special meetings of stockholders may be called at any time by the president (at the written request of two stockholders) upon five days' notice by mail upon each stockholder, and that a special meeting of the board of directors may be called by the president (at the written request of two directors) by giving three days' notice by mail to each director. Notice of the meeting of stockholders of January 3d was mailed at Minneapolis, December 27th, directed to plaintiff at that place, and notice of the meeting of directors of January 25th was mailed at Minneapolis, January 21st, directed to plaintiff (he being then a director) at that place.

The grounds of demurrer assigned are that several causes of action are improperly united, and that the complaint does not state facts sufficient to constitute a cause of action.

It is claimed by defendants that the complaint attempts to set forth four separate causes of action, based on—*First,* the vote of back-pay to Dorilus and Clinton Morrison; *second,* the attempt to dispose of the 340 shares of stock held in trust by Clinton Morrison; *third,* the vote fixing the salary of Dorilus and Clinton Morrison and Murdock; *fourth,* the increase of the capital stock; and that these are not all included in the "same transaction or transactions connected with the same subject of action," and that they do not affect all the parties to the action. If these several acts were separate and independent transactions, with no connection between them, they could not be joined in the same complaint. But the general subject affected by the various acts is the same, to wit, the rights and interests of plaintiff as a stockholder in the corporation. The complaint alleges a plan or scheme—a conspiracy—by Dorilus and Clinton Morrison to cheat and defraud him in respect to such rights and interests, and that the specific acts charged were done to carry the scheme into effect. If this were so, they were part and parcel of it, each specific act as much so as any other. The object of the action is to protect plaintiff's rights and interests as a stockholder in the corporation from the invasion contemplated by the conspiracy, to undo what has been

done pursuant to it, so that his rights and interests shall remain as though the conspiracy had not been attempted. It is immaterial that the acts differ in their particular character, that they were done at different times, and that the defendants do not all claim to be interested in, or benefited by, each of them, or in the same degree in any one of them.

As to this ground of demurrer the case does not differ in principle from *Mitchell* v. *Bank of St. Paul*, 7 Minn. 192, (252;) *North* v. *Bradway*, 9 Minn. 169, (183;) and *Palmer* v. *Tyler*, 15 Minn. 81, (106.) There was no misjoinder of causes of action.

Of the several acts involved in the cause of action alleged, we will consider, *first*, the attempt to dispose of the 340 shares of old stock held by Clinton Morrison in trust for himself, the plaintiff, and Dorilus Morrison, in proportion to the shares of old stock held by them at the time the 340 shares were issued. According to the complaint, these shares not having been issued, and the corporation having funds on hand, such funds were used in paying for the shares, and they were issued to Clinton Morrison to be held in trust as hereinbefore stated. Defendants claim that this use of the corporate funds was wrongful; that the trust thereby attempted to be created was invalid; and that the corporation could still control the shares and direct how they should be disposed of. If it were true that the purchase with the corporate money and issue of the shares to Clinton Morrison were wrongful and invalid, it would not make the vote of the directors to sell it at par valid, for it would belong to the corporation as unissued stock; and, in respect to the power of the directors to dispose of it, it would stand on the same footing as the new or increased stock. But is the claim that the transaction was wrongful well founded? It does not appear that there were any creditors of the corporation to be injured by it, and all the stockholders consented to it. Who, then, can complain? Who was prejudiced by it? Whose rights were affected except those consenting?

So far as the facts alleged in the complaint show the transaction, it was valid, and, that being so, the vote of the directors to sell the shares was wrongful. But, it is argued, the shares had not been disposed of pursuant to the vote, and the defendants may not carry it

into effect. If they threaten to dispose of the stock, (and the vote is such a threat,) that furnishes ground for relief in equity.

The vote of back-pay to Dorilus and Clinton Morrison was, in effect, an appropriation by and to themselves of the funds of the corporation. By it there was taken, or attempted to be taken, from the corporate treasury, and donated to Dorilus Morrison, $39,375, and to Clinton Morrison, $7,200,—in all, $46,575,—and this by a vote at a meeting of directors at which four directors were present,—two of them, Dorilus and Clinton Morrison, and another, H. G. O. Morrison, alleged by the complaint to have been only a tool of the other Morrisons. According to the allegations of the complaint, the past services of Dorilus Morrison, which were made the pretext for this appropriation of corporate funds, had been rendered, as had been similar and equal services by the plaintiff, to advance their interests as stockholders in the corporation, and upon the previous understanding that they should be rendered without compensation; and the past services of Clinton Morrison, the pretext for the appropriation to him, had been rendered for a salary agreed upon between him and the corporation. The corporation owed them nothing, therefore was under no legal or moral obligation to pay them any part of the sums so appropriated to them. If such a transaction is to be sustained,—if the directors can legally, upon such pretexts, appropriate to themselves the corporate funds,—then the rights and interests of a stockholder rest on a very precarious footing. But, aside from the consideration that the Morrisons, while as directors voting this gift of corporate moneys, were themselves the donees, they had no authority to so dispose of the property of the corporation. It is true, the authority over the property and affairs of a corporation, given by the statute to the board of directors, is very extensive. "The stock, property, affairs, and business of every such corporation shall be under the care of and shall be managed by not less than three directors." Gen. St. 1878, c. 34, § 124. But this authority is subject to the implied condition that it shall be exercised solely in pursuance of the company's chartered purposes, and for the benefit of the stockholders. Morawetz on Private Corp. § 242; *Pickering* v. *Stephenson*, L. R. 14 Eq. 322; *Minor*

v. *Mechanics' Bank,* 1 Pet. 46, 71; *Salem Bank* v. *Gloucester Bank,* 17 Mass. 1, 30; *St. James' Church* v. *Church of Redeemer,* 45 Barb. 356. It does not extend to dividing the property of the corporation among themselves, nor giving it to others. The vote of back-pay was, therefore, void.

The validity of the vote fixing the salary of Dorilus Morrison, as president, of Clinton Morrison, as vice-president, and S. S. Murdock, as general manager, must be judged upon other considerations. There is no question that, unless otherwise provided in the articles of incorporation, the board of directors has authority to fix the compensation of officers of the corporation. When, however, as directors, they fix the compensation for their own services, either as directors or other officers, their act is not necessarily valid. They are agents of the corporation, and, as in cases of other agents, their acts on behalf of their principal, in matters where their own interests come in conflict with those of the corporation,—where their self-interest may tend to deprive the corporation of the full, free, and impartial exercise of the judgment and discretion which they owe to their principal,—are looked upon and scrutinized with great jealousy by the courts. Their acts in such cases are, *prima facie,* voidable at the election of the corporation or of a stockholder. *Cumberland Coal, etc., Co.* v. *Parish,* 42 Md. 598; *Butts* v. *Wood,* 37 N. Y. 317; *Coleman* v. *Second Ave. R. Co.,* 38 N. Y. 201; *Hoyle* v. *Plattsburgh & M. R. Co.,* 54 N. Y. 314; *Blake* v. *Buffalo Creek R. Co.,* 56 N. Y. 485; *Covington, etc., R. Co.* v. *Bowler,* 9 Bush, 468; *Paine* v. *Lake Erie, etc., R. Co.,* 31 Ind. 283; *Port* v. *Russell,* 36 Ind. 60; *Cook* v. *Berlin Woolen Mill Co.,* 43 Wis. 433; *European, etc., Ry. Co.* v. *Poor,* 59 Me. 277; *Bestor* v. *Wathen,* 60 Ill. 138; *Harts* v. *Brown,* 77 Ill. 226; *Simons* v. *Vulcan Oil, etc., Co.,* 61 Pa. St. 202; *Rice's Appeal,* 79 Pa. St. 168; *First Nat. Bank* v. *Gifford,* 47 Iowa, 575; *Gardner* v. *Butler,* 30 N. J. Eq. 702. The rule is applied rigorously to votes giving themselves compensation. Thompson on Officers of Corporations, 351, and note; *Maux Ferry Gravel R. Co.* v. *Branegan,* 40 Ind. 361; so that they cannot properly act on, nor form part of a quorum to act on, a proposition to increase their compensation. *Butts* v. *Wood, supra; Bank* v. *Collins,* 7 Ala. 95.

As appears from the complaint, there were four directors present when the resolution was passed fixing the salaries. Of these it fixed the salaries of three: of Dorilus Morrison, as president, at $15,000 per year, when it is alleged $1,200 a year would be a reasonable salary; and of Clinton Morrison at $10,000, when it is alleged $5,000 a year would be a reasonable salary. Upon the statements of the complaint, the vote cannot be sustained. Perhaps Murdock was entitled to the salary fixed by this vote, upon a previous resolution of the board suggested by the complaint. But his right to it cannot stand on the resolution in question, for it was invalid, as well as to him as to the others.

The next specific act of wrong alleged in the complaint is the proceeding increasing the capital stock, and disposing of it.

The first objection made by plaintiff to the increase of capital stock is for insufficiency of notice of the meeting of stockholders at which it was voted; that the notice was generally insufficient, because it was published only 7 days before the meeting, whereas, as plaintiff claims, it ought to have been published 15 days, as required by Gen. St. 1878, *c.* 34, § 123, (Laws 1873, *c.* 11, § 4, as amended by Laws 1878, *c.* 28, § 1;) and that, if otherwise proper, it was insufficient as to him, (and this last objection is made to the notice of some meetings of the board of directors,) because, owing to his absence in Europe, it was impossible for it to reach him in time for him to take action upon it.

In a case free from an actual fraudulent intent to take advantage of a stockholder's or director's absence, and, while going through the form of giving notice, to give none in fact, there would be nothing in this second objection. Where notice for a given time, by publication or by mail, is required, the publishing or mailing the notice the given time before the meeting must ordinarily be sufficient, although the stockholder or director may reside, or be temporarily, at such a distance that the notice will not reach him. For if the stockholder or director could insist upon such length of notice as would enable him to be present, whether at the time of the call he be at the place of meeting or upon the other side of the globe, it might, in some cases, be almost impracticable for corporations to do any business requiring

meetings of stockholders or directors.    If there be any likelihood that notice, given as prescribed, may not reach him in time, it is the duty of the stockholder or director to anticipate such an event, and make what provision he can for it.    The mere fact, therefore, that, owing to plaintiff having removed his residence from Minneapolis to Europe, it was impossible for the notice to reach him in time, furnishes no objection to its sufficiency, nor to the regularity of the meeting held pursuant to it.

To determine what length of notice was necessary requires the examination and comparison of some sections of the statute regulating the formation and action of manufacturing corporations.

Gen. St. 1878, c. 34, § 121, (Laws 1873, c. 11, § 2,) provides that the amount of capital stock of a manufacturing corporation shall be fixed and limited by the articles of incorporation, but every such corporation may increase its capital stock, and the number of shares therein, at any meeting of the stockholders specially named for that purpose.    Section 123 (Laws 1873, c. 11, § 4, as amended in 1878) provides the first meeting of stockholders shall be upon a notice published 15 days, and that subsequent meetings may be called in such manner as the by-laws shall prescribe.    Section 122 provided that the articles of incorporation might be amended at a meeting of stockholders held for that purpose, upon the notice required by section 123 (act of 1873, § 4) for the first meeting of stockholders.    Section 122 was amended by Laws 1879, c. 8, § 1, by adding a proviso permitting an amendment of the articles by resolution duly passed at any regular meeting of the stockholders.    The effect of this was to dispense with the necessity existing under section 122, as it stood before, of notice such as required for the first meeting of stockholders, and to allow such an amendment at any regular meeting, whether called as prescribed by the by-laws, or (where they make no provision on the subject) by the statutes.    So that, treating the increasing of the capital stock as an amendment of the original articles of incorporation, (and such was its effect,) it might be done at any regular meeting, though not called upon the notice required for the first meeting; and the meeting in question, having been called upon the notice prescribed in the by-laws, was a regular meeting, at which the

capital stock might be increased. As the increase was contemplated by the original articles, and was made in the exercise of a power given by the statute, and in the manner prescribed by the statute, and especially as we cannot see how the plaintiff could be prejudiced by the increase, if the new stock be properly disposed of, the motive which led the parties to make the increase is immaterial. As appears from the complaint, therefore, the increase was valid.

The disposition that was made of the new stock presents the most important question in the case, not only as it affects the interests of the plaintiff, but in its bearing on the rights of stockholders in corporations.

How it affected the interests of the plaintiff appears from this statement:

The outstanding stock was, - - - - - $150,000
Of which plaintiff owned, (including his interest in that held
   in trust by C. Morrison,) in round figures, - - 51,000
The net assets of the corporation, - - - 450,000
So that, before the increase, plaintiff's stock was worth, - 153,000

After the increase it stood thus:

Net assets of corporation, - - - - - $450,000
Notes taken for new stock, - - - - 350,000

      Total assets, - - - - - - $800,000

Stock outstanding, - - - - - - $500,000
Actual value of stock, - - - - - 160 per cent.
Actual value of plaintiff's stock, - - - - $ 81,600
So that the actual value of plaintiff's stock was depreciated by
   the operation, - - - - - - 71,400

The defendants have gained that amount at his expense.

The case presents the question, have a majority of stockholders in a corporation the right to dispose, without the consent of the minority, of new stock, without regard to its actual value? If they have, the interests of the minority stockholders are, to a large extent, at the mercy of the majority. Fortunately, the rule of law determining the rights of stockholders in such a case is pretty well settled. In *Gray*

v. *Portland Bank,* 3 Mass. 363, the corporation, a bank, had the power to increase the capital stock up to a certain limit, and did so increase it. The plaintiff, an original stockholder, claimed the right to subscribe to the new or increased stock, in proportion to the original stock held by him,—a right which the corporation denied, and it refused to receive his subscription. The court sustained the claim of plaintiff. The principle upon which such right of a stockholder rests is stated by the court to be that a corporation is (p. 379) "a trust created with certain limitations and authorities, in which the corporation is the trustee for the management of the property, and each stockholder a *cestui qui trust,* according to his interest and shares," and a "share in the stock or trust, when only the least sum has been paid in, is a share in the power of increasing it, when the trustee determines, or rather when the *cestui qui trusts* agree, upon employing a greater sum within the limits provided in the purposes of the trust," and that the power is not one "to create another interest for the benefit of other persons than those concerned in the original trust, or for their benefit in any other proportions than those determined **by their subsisting** shares."

In the foregoing quotation the language, "the least sum has been paid in," refers to a case where the capital is limited to be not less than one sum, and not more than a certain greater sum, and the less sum has been subscribed for and paid in, and the corporation has commenced business upon it. When the proposition that a corporation is trustee of the corporate property, for the benefit of the stockholders, in proportion to the stock held by them, is admitted, (and we find no well-considered case which denies it,) it covers as well the power to issue new stock as any other franchise or property which may be of value, held by the corporation. The value of that power, where it has an actual value, is given to it by the property acquired and the business built up with the money paid in by the subsisting stockholders. It happens not infrequently that corporations, instead of distributing their profits in the way of dividends to stockholders, accumulate them till a large surplus is on hand. No one would deny that, in such case, each stockholder has an interest in the sur-

plus, which the courts will protect. No one would claim that the officers, directors, or majority of the stockholders, without the consent of all, could give away the surplus, or devote it to any other than the general purposes of the corporation. But when new stock is issued, each share of it has an interest in the surplus equal to that pertaining to each share of the original stock. And if the corporation, either through the officers, directors, or majority of stockholders, may dispose of the new stock to whomsoever it will, at whatever price it may fix, then it has the power to diminish the value of each share of old stock, by letting in other parties to an equal interest in the surplus, and in the good-will or value of the established business.

The rule laid down in *Gray* v. *Portland Bank* has been recognized and followed, almost without exception, since the case was decided. Morawetz on Private Corp. §§ 349, 350; Ang. & Ames on Corp. §§ 554, 555; Field on Corp. § 124; *State* v. *Franklin Bank,* 10 Ohio, 91; *Eidman* v. *Bowman,* 58 Ill. 444; *Miller* v. *Illinois Cent. R. Co.,* 24 Barb. 312; *Bank* v. *Reese,* 26 Pa. St. 143; *Reese* v. *Bank,* 31 Pa. St. 78; *Atkins* v. *Albree,* 12 Allen, 359; *State* v. *Smith,* 48 Vt. 266; *Jones* v. *Terre Haute, etc., R. Co.,* 57 N. Y. 196; *Taylor* v. *Miami Exporting Co.,* 5 Ohio, 162; *Peabody* v. *Flint,* 6 Allen, 52; *Dousman* v. *Wisconsin, L. S., etc., Co.,* 40 Wis. 418.

The plaintiff was therefore entitled to an opportunity to subscribe for and take new stock, in proportion to the old stock held by him. He had no such opportunity. The right given by the resolution of January 3, 1882, to the old stockholders, to subscribe on written application on or before January 14th, was, so far as plaintiff was concerned, a mere mockery, he being at the time in a part of Europe from which it would require a letter, in due course of mail, 18 days to reach Minneapolis. There is no doubt that an old stockholder may waive his right to subscribe for new stock. What, in that event, is to be done with his proportionate share of it need not now be considered, though it would hardly seem as though the other stockholders could either appropriate it among themseves, or dispose of it for less than the market value. No express repudiation by plaintiff of the defendants' acts was necessary, and it does not appear that he

has acquiesced in them.    The objection that he does not offer to take
and pay for the new stock to which he claims to be entitled affects at
most only the character or measure of relief he is to have.

Order affirmed.