WILLIAM R. BENNETT ET AL., APPELLEES, V. JAMES E. BAUM ET AL., APPELLANTS.

FILED NOVEMBER 28, 1911. No. 16,484.

1. Appeal: PLEADING: MOTION TO MAKE DEFINITE. An order of the district court requiring defendants to make their answer more definite and certain will ordinarily be sustained, unless it clearly appears that thereby the court abused its discretion to the defendants' prejudice.

2. Exceptions, Bill of: SETTLEMENT BY REFEREE. A referee has sole authority to settle and allow a bill of exceptions of the evidence adduced during the trial before him.

3. Reference: POWER OF COURT. Section 299 of the code, among other things, authorizes the district court without the consent of the parties to refer issues of fact or of law in equitable actions where it becomes necessary to examine mutual accounts, or where the account is on one side and it is necessary to examine the party to that side to prove the account, or where the taking of an account is necessary for the information of the court before judgment.

4. ———: PROCEDURE. And in such a case it is not jurisdictional that the court shall first enter an interlocutory order that either party is entitled to an accounting.

5. Corporations: INCREASE OF STOCK: RIGHTS OF STOCKHOLDERS. The power of a corporation to increase its capital stock is held by it in trust for its stockholders and should be exercised so that every

stockholder may, within a reasonable time after notice of such increase, subscribe for the increased issue in proportion to his prior holding.

6. ———: SUITS BETWEEN STOCKHOLDERS: EQUITABLE RELIEF. Where all of the stockholders of a corporation and the corporation are before a court of general jurisdiction in an equitable action involving the rights of the stockholders in the corporation, the law looks to substance rather than to form, and, if the rights of third persons will not be prejudiced thereby, and the pleadings and evidence justify, will apply the rules of equitable estoppel to prevent one stockholder from doing an injustice to another.

7. Contracts: CONSIDERATION. All of the parts of the transaction will be considered to ascertain whether a consideration sustains a contract.

8. Corporations: REINCORPORATION: ESTOPPEL. Where, after A agrees, upon a lawful and sufficient consideration, to organize a corporation, transfer to it definitely described chattels and real estate, and give to B one-fifth part of its capital stock, the attempted incorporation is found to be invalid, or A believes it to be invalid and reincorporates, transferring to the subsequent corporation all of the property held by the first, and B with knowledge of the fact exchanges stock issued by the simulated for that of the second corporation and retains it for two years without question or objection, and A changes his position in reliance upon the validity of the latter corporation, B is estopped from asserting that the first one is legal and the subsequent one illegal.

9. Judgment: PLEADING AND PROOF. Unless the allegations and the proofs agree, or the record discloses that the litigants tried an issue as though it were joined by the pleadings, so much of a decree as does not respond to the admissions in or issues joined by the pleadings cannot be sustained.

10. Appeal: AMENDMENT TO CONFORM TO PROOF. Where it is clear that all of the evidence to sustain or defeat an issue was adduced by the respective litigants in an equitable action in the district court, it is competent on an appeal for this court in the interests of justice to permit amended pleadings to be filed so as to conform to that proof.

11. Reference: ALLOWANCE TO REFEREE. In an action involving an accounting of the business affairs of a corporation which for four years transacted an annual business of about $2,000,000, and owned net assets of the value of $572,392, where a lawyer of great experience and high standing at the bar acts as referee and the hearing continues eight months, a fee of $7,500, allowed by the

24

district court upon undisputed 'evidence that the services were worth $10,000, will not be reduced on appeal.

12. **Costs.** And in such an action, where the plaintiffs are given partial but substantial relief, and it appears just that the costs should have had been taxed in the district. court against the corporation in whose name the title to the property over which the parties are contending is vested, an order to that effect will not be disturbed on appeal.

APPEAL from the district court for Douglas county: LEE S. ESTELLE, JUDGE. *Judgment modified.*

*John J. Sullivan* and *Baldrige, De Bord & Fradenburg,* for appellants.

*John F. Stout, E. C. Strode* and *W. S. Summers,* contra.

ROOT, J.

This is an action in equity to compel the defendants Baum to account for the property and profits of a corporation, to declare dividends upon the plaintiffs' stock, for the appointment of a receiver, and for equitable relief. The plaintiffs prevailed in part, and the defendants appeal.

In making up the issues, the district court sustained plaintiffs' motion to make the answer more definite and certain. In this we think no substantial injury was inflicted upon the defendants, and shall give the subject no further consideration.

'After the issues were joined, the court, upon the plaintiffs' motion, appointed William Baird, Esquire, a reputable, experienced member of the bar, as a referee to take testimony and to report to the court findings of fact and conclusions of law. This was done. The defendants' exceptions to parts of the report were overruled by the district court and the report was confirmed.

The plaintiffs move to quash the bill of exceptions because it was settled and allowed by the referee, and ᵐot

by the judge. It is evident that all of the evidence was introduced before the referee, and that the district court acted solely upon the report of that officer. The referee should settle the bill. Code, sec. 303. The plaintiffs' contention has been repeatedly raised and uniformly overruled in other cases in the same plight as the instant one, and the question should no longer be considered subject to discussion. *Light v. Kennard,* 10 Neb. 330; *Turner v. Turner,* 12 Neb. 161; *State v. Gaslin,* 30 Neb. 651; *Whalen v. Brennan,* 34 Neb. 129; *Carlson v. Beckman,* 35 Neb. 392; *Disbrow & Co. v. McNish,* 52 Neb. 309. The motion is overruled. The other questions of law grow out of the facts, which we shall state and comment upon as concisely as the record will justify. The referee made elaborate findings of fact, many of which are not challanged by the defendants, yet for a proper understanding of the case some of them should be referred to in this opinion.

For 23 years prior to 1901 Samuel F. Bennett and his associates, either as partners or the members of a corporation, were engaged in a profitable retail mercantile business on Capital avenue in the city of Omaha. The business had been advertised consistently and extensively, and the corporation was well and favorably known to its customers. In the spring of 1901 the W. R. Bennett Building Company, a corporation controlled by W. R. Bennett and S. F. Bennett, purchased lots 1 and 2 and the east two-thirds of lot 3, all in block 146 in the city of Omaha, and lot 5 in that block. Upon the first described tract, which is located at the corner of Sixteenth and Harney streets, a substantial five-story building was constructed and prepared for a department store; on the last described lot a barn was built. The W. R. Bennett Company, a corporation which controlled the mercantile establishment on Capital avenue, moved its merchandise into the new building at Sixteenth and Harney streets, and transacted business therein until December, 1902, or January, 1903. During these months, the exact date being immaterial, the W. R. Bennett Company was duly de-

clared a bankrupt by a judgment of the district court of
the United States for the district of Nebraska. Either
W. R. Bennett or S. F. Bennett, or both of them, inter-
ested J. E. Baum and D. A. Baum, wealthy ironmasters
of Omaha, in the Bennett business to the extent that the
Baums agreed to try and effect a composition with the
Bennett creditors so that the business might continue;
but these negotiations failed. At the time this cause was
tried S. F. Bennett had departed this life. The evidence
is not clear concerning the negotiations leading up to the
execution of the contract upon which the plaintiffs rest
their case. Probably the fact that the agreement is in
writing influenced counsel to adopt the theory that in-
quiry should proceed from the date of its execution. How-
ever, there is sufficient evidence to justify the conclusion
that Mr. S. F. Bennett, who was also adjudged a bank-
rupt, desired to save something from the wreck of his
fortune, and that he believed the business could be profit-
ably continued by the Baums in company with himself.
At any rate, the Baums purchased at trustee's sale for
about $80,000 all of the assets of the W. R. Bennett Com-
pany, including a stock of merchandise which invoiced at
$140,000, and demands against the W. R. Bennett Build-
ing Company aggregating $184,000, of which $84,000 was
evidenced by an open account, the balance by promissory
notes. This sale was confirmed by the court during the
forenoon of February 23, 1903, and immediately there-
after a special meeting of the stockholders of the W. R.
Bennett Building Company was held in the office of its
counsel, all of the stockholders being present in person or
by proxy, and the directors were then authorized to trans-
fer all of its assets, which consisted exclusively of real
estate, to the defendant J. E. Baum for the alleged con-
sideration that the Baums should cancel the $84,000
book account purchased by them. The deed was there-
upon executed and the account canceled. About 6 o'clock
P. M. of that day J. E. Baum signed and delivered to S.
F. Bennett the following writing: "To S. F. Bennett, N.

E. Bennett, Jennie S. Brown and Mary L. Wade: In consideration of the transfer to the undersigned of all the real estate of the W. R. Bennett Building Company, I hereby agree to form a corporation and transfer to it all of the property rights, assets and claims of every kind and nature of the W. R. Bennett Company which I have acquired by purchase at trustee's sale in bankruptcy proceedings, and of the W. R. Bennett Building Company which I have acquired by conveyance from the said company in exchange for the entire issue of the corporate stock of the new corporation to be formed; and that upon the said stock being issued to me, I will transfer to you the one-fifth part of all the said issue of said corporate stock of the new corporation; the said shares to be issued to you jointly or severally in such proportion as you may in writing designate. J. E. Baum." During the evening of that day, or of some other day in close proximity thereto, the evidence being contradictory as to the precise date, the Baums, the Bennetts and Dr. Brown of Lincoln, husband of Jennie S. Brown, discussed the position that the Bennetts should occupy in the new corporation and the salaries to be paid them. After considerable negotiations, it was agreed that S. F. Bennett should be paid $100 a month, and W. R. Bennett should receive $3,000 per annum and should be the manager of the departments. The term of his employment was not named. W. R. Bennett prepared a written memorandum which he produced at that meeting. It is as follows:

"REORGANIZATION.

Name.—The Bennett Co.
Composed of J. E. Baum, D. A. Baum, W. R. B.
          "        "

Life of corporation.
Capital Stock (Com.)
Made up of—
One-fifth (1-5) of total capital, to W. R. B., or order
        fully paid—

Additional Stock issued.

Privilege to W. R. B. or associates to buy 1-5 of new stock & pay for same in cash or note.

No stock to be sold without first giving present stockholders opportunity to buy—

Position W. R. B. to hold

Salary        "       " have

Length of contract, etc.

Position of S. F. B.

Salary      "        "

Length of position

Release of lot 5, Reed's 2d to C. S. Bennett estate

Consideration being equity, name, & good. will."

The Baums testify that this memorandum, which was not signed, was produced at a meeting held before the contract was made. W. R. Bennett testifies the meeting was held the night of the day the contract was signed. We do not consider the date material, but incline to the view that the memorandum casts some light upon a subject which we shall subsequently discuss. The first of April, 1903, the Baums opened the department store, and thenceforward until the month of October, 1903, continued the business under the name of the Bennett Company. During this month the Baums incorporated, or sought to incorporate, two corporations, under the laws of Delaware. One, under the name of the Bennett Company, had an authorized capital of $80,000, and no provision was made in the articles for amendments. The certificates of stock were not issued until March, 1904. The property purchased at trustee's sale, less so much as had been sold and plus all increments, was transferred to the Bennett Company in consideration for its capital stock, of which one-fifth part was issued to R. S. Hall, as trustee for the Bennetts. We have discovered no evidence to instruct us concerning the nature of this trust. The other corporation was described as the Baum Building & Realty Company. Its capital stock is $20,000, and 40 shares were issued to Mr. Hall, as trustee. The legal

title to the real estate conveyed by the W. R. Bennett Building Company to Mr. Baum was not transferred to the corporation; but a written proposition made by him to it that he would transfer title to the real estate in consideration for all of its capital stock was accepted.   Mr. Baum testifies that he retained the title because a debt secured by mortgage on the property having matured, he could not secure a new loan at a reasonable rate of interest in the corporate name, but was compelled to sign the notes and therefore retained title as indemnity should he be compelled to pay any part of the debt.

S. F. Bennett and his associates did not control sufficient capital to stock all of the departments in the store, so they leased many of them to. individuals.   The Baums, as rapidly as these leases expired and conditions were favorable, purchased in the name of the Bennett Company merchandise and stocked these departments. The Baums reorganized the scheme of business, financial and otherwise, economized in many ways, and increased the gross sales and the net profits so that in 1907, when this suit was commenced, they employed 14 buyers and from 400 to 500 clerks, and the gross annual sales of the combined departments exceeded $2,000,000, upon which a considerable profit was made.   The Baums enjoyed high credit and borrowed large sums of money which were used to extend and carry on the business of the Bennett Company.   At the same time, they operated the Baum Iron Works and the New Paddock-Hawley Company, corporations owning and controlling valuable properties, and engaged in great business enterprises. The Baums, with the exception of a Mr. Virden, who resided in Delaware and held but one share of stock, were the sole directors and controlled the corporate affairs of the Bennett Company and of the Baum Building & Realty Company as absolutely as though they individually owned all of the assets of those corporations.   The Baums maintained no private bank accounts, but all of their bills were paid by the Bennett Company, and their

private funds were deposited in the Bennett Company bank account. Likewise they paid for private investments by checking on that account, but their personal accounts in the books of the Bennett Company were charged for the money thus paid. They also purchased two valuable tracts of Omaha real estate, taking the title in the name of one of the Baums, and paying therefor out of the Bennett Company funds. The entries in the Bennett Company's books tend to prove that the corporation is the beneficial owner of this property. They also carried on the books of the Bennett Company accounts with the several corporations controlled by them. At times these corporations would be creditors of the Bennett Company and at times were its debtors. That is to say, the credits of the several corporations would be massed for the benefit of one at times when that credit was most needed by the debtor company, and at times the Baums individually profited by temporary credits on the books of the Bennett Company. On the other hand, the Bennett Company was indebted at times in large sums to the Baums, and to their several corporations. In the summer of 1904 the Baums submitted to their counsel, Mr. Charlton, the articles of incorporation of the Bennett Company and of the Baum Building & Realty Company, and were advised by him that the incorporations were so defective that it was not safe to continue transacting business in this manner. Whereupon two corporations were formed with names identical with those of the original corporations, or simulated corporations, but the capital stock of the Bennett Company was fixed at $200,000 instead of $80,000, and the amount of capital stock of the Baum Building & Realty Company was also increased. The stock of each corporation was divided into common and preferred. All of the stock of the old corporations was called in and exchanged for an equal amount of the new corporations' common stock. There then remained $120,000 of stock of the Bennett Company, one-half of

which was treated as treasury stock, and the remainder was not issued. We do not consider further consideration of the Building Company stock material, and will devote our attention to that of the Bennett Company.

On August 8, 1905, the directors of the Bennett Company by resolution ordered that $40,000 of preferred and $20,000 of common stock of the Bennett Company should be issued and sold at par, plus 6 per cent. annual interest from January, 1904, and the stockholders were given until August 19 in which to subscribe therefor. August 14 written notice was sent to those interested in the Bennett stock and to the trustee that they had until the 19th of the month to subscribe for their *pro rata* share of this stock. They did not subscribe, and the 600 shares were issued, one-half to J. E. Baum and the other half to D. A. Baum. We are of opinion that the plaintiffs from any standpoint have cause for complaint concerning this conduct of the Baums in giving them so short a time within which to subscribe and pay for this stock. *Jones v. Morrison,* 31 Minn. 140. Moreover, there is evidence tending strongly to prove that the Baums issued all of the stock to themselves before the 19th of August. No attempt was made to ascertain the net worth of the corporation at this time, or to offer for sale or to sell the additional stock at the premium it should bear in order that its contribution might equal the value of property represented by the $80,000 original stock. In April, 1903, the $80,000 purchased not only $140,000 worth of merchandise, but the equity in the real estate formerly owned by the W. R. Bennett Building Company. The proof shows that this real estate increased rapidly in value in the meantime, and that the affairs of the Bennett Company had been prosperous, so that the stock should have been worth, and in all probability was worth, much more than par. By acquiring this stock at a trifle above par, the Baums, controlling directors of the corporation, participated in the surplus which should have been credited to the $80,000 and depreciated the

value of all of the stock held by Hall, trustee. The referee was therefore right in finding that this issue of stock should be canceled. *Jones v. Morrison, supra.*

Although the Baums subscribed for this stock, they paid no money therefor, but it was charged to their account. Subsequently the certificates were canceled and new ones in like amounts issued to the Baum Iron Company and to the New Paddock-Hawley Company. The defendants Baum contend that, since those transferees are not parties to this action, the decree directing the cancelation of this stock is void and should not be sustained. Those corporations are not parties to this record, but the evidence is uncontradicted that the Baums control them and own practically all of their capital stock. The Baums will have no trouble in satisfying any demands that may be made by the other stockholders of those corporations for any profits lost by the cancelation of this stock. The referee, with the assistance of the expert accountants, made findings which cover the state of the accounts between the Bennett Company, on the one hand, and the Baums and their various corporations, on the other. The referee found that there were errors in the accounts in the books of the Bennett Company and corrected them. We do not understand that the experts and counsel for the respective litigants dispute the conclusions of the referee upon this phase of the case, and further consideration will not be given thereto.

It is urged that no account should have been taken, because the books were open for the plaintiffs' inspection, that the Baums were willing to submit a detailed statement of the condition of the corporation's business, that none of the allegations of fraud charged against the defendants were found true, and because no interlocutory order was made that the plaintiffs were entitled to an accounting. Upon the last point the arguments made and the authorities cited would be more relevant in a jurisdiction where the ancient action of account is

recognized and its procedure adhered to; but in Nebraska section 299 of the code authorizes a reference without the consent of the parties in equitable actions where the trial of an issue of fact requires the examination of mutual accounts, where an account on one side must be considered in connection with the testimony of the party to that side, or where the taking of an account is necessary for the information of the court before judgment. The code does not require an interlocutory order that either litigant is entitled to an accounting with the other, as a condition precedent to the reference. The code was enacted to simplify legal procedure and eliminate unnecessary ceremony. Doubtless, if the litigants do not admit a state of facts entitling one or the other to an account, the court might properly try the issues until it appeared from the evidence that an accounting was necessary and then make its order, but such a course is not necessary in every case. In the instant one the defendants were in control as directors of a corporation owning great quantities of personal property and transacting a vast business. Owning 80 per cent. of the capital stock, the Baums could not be ousted from complete control. They had not called or held a stockholders' meeting for years, and in effect refused to inform the plaintiffs, minority stockholders, concerning the condition of the corporation's property and its business affairs. The entries in the corporation's books of account were such that no one other than an expert, aided by an inspection of documents independent of the books and in the defendants' possession, could ascertain the condition of the corporation's business, and the defendants refused to permit the plaintiffs to put an expert at work on the books. Although the defendants at no time absolutely refused to give the plaintiffs a statement of the condition of the corporation's business and property, they did not furnish it. Frequently importuned, they promised, but did not perform, although a monthly trial balance was taken and semiannually a complete inven-

tory of all the assets of the corporation was made.
There is some conflict in the testimony concerning what
was said and agreed to at the last conference at Mr.
Baum's house a few weeks preceding the commencement
of the action, and the plaintiffs are charged with bad
faith in not abiding by the alleged agreement of their
counsel. We are satisfied that Mr. W. R. Bennett was
angry at the Baums because he had been supplanted by
Mr. Schantz, and that he may be responsible in a way for
the commencement of this action. We are also satisfied
that the Baums were not preparing the statement, but
were pursuing their wonted course. The real estate
which Baum agreed to transfer to the corporation was
valued on the books of the Bennett Company at
$79,291.17, whereas the referee found that in December,
1907, the net value was $340,823. There were errors in
the entries in the books aggregating about $150,000, not
false entries, but erroneous ones, some of which balanced
other errors of like amount. Not all of the accounts
were self-explanatory. In short, the condition of the
books was such that it was absolutely necessary to inter-
rogate the Baums with regard thereto in order that the
district court might enter a judgment which would do
justice to all of the parties. We therefore conclude that
no error was committed in referring the case.

Complaint is made that the trial was unduly pro-
longed, whereby great expense was incurred, which
should be taxed to the plaintiffs instead of to the Ben-
nett Company. Considerable evidence adduced might
have been omitted without depriving the court of knowl-
edge of all of the material facts; many of counsels'
suggestions and some of the referee's remarks, all of
which are recorded, might have been eliminated without
prejudice to the rights of either litigant. The parties
seem to have been unduly suspicious of each other and
aggressively active in attempting to exclude evidence.
As it is, all of the corporation's transactions were mi-
nutely examined, and much testimony was given to explain

the entries in the books.    We are not inclined to disturb
the taxation of costs entered by the district court.

Nor do we consider the referee's fee unduly extravagant.
The referee devoted about eight months to the taking of
testimony and several other months to a consideration
of the evidence.    The referee's affidavit that $10,000 is a
reasonable fee for his services is not controverted by any
evidence, written or oral, so that the allowance of $7,500
will not be disturbed by us.

As we understand the record and arguments, the
Baums' most serious contentions are that the district
court erred in adopting the referee's recommendation
that the corporation organized in the summer of 1904 is
illegal and its capital stock should be canceled; that the
first incorporation, or attempted incorporation, in 1903
is legal and should control, and in enjoining an increase
of its capital stock.    To us it seems immaterial whether
or not the first corporation was legally organized.
Practically all of the stock of these corporations is held
or controlled by the plaintiffs and by whomsoever
succeeded to the interests of Richard Hall, as trustee,
on the one side, and by the defendants Baum, on the
other.    The litigants are in a court of equity, which
looks to substance rather than to form.    We incline in
part to the view of the defendants' counsel that the
plaintiffs and their trustee by long acquiescence in the
validity of the second corporation ratified the reincor-
poration.    Mr. Hall testifies that, when requested by the
Baums to exchange the stock first issued for that of the
second corporation, he consulted with Mr. Bennett, and
it was agreed that the exchange should be made on the
theory that the first incorporation was defective.    No
objections were raised and no attack was made upon the
validity of the second incorporation until at least sub-
sequent to the commencement of taking testimony in
this case.    In fact, we find no allegation in the petition
to sustain the charges made in the briefs, or the findings
of the referee that the second incorporation is invalid

and an attempted amendment of the original incorporation. Assuming that the litigants by the introduction of evidence have imported these subjects into the issues, we do not hesitate to say that the plaintiffs are estopped at this late day to insist that the first incorporation was valid, and the second one invalid, because its articles are amendatory of the former and the articles first adopted do not provide for amendments. It was certainly understood by all of the parties in interest that the first articles of incorporation and the corporation itself should be abandoned and the second articles accepted in substitution of the former. We do not assume to say that the state of Delaware may not by proper action dissolve the second corporation; but we do say that, the parties in interest other than that state being before us, we will apply the well-known rules of equitable estoppel to prevent one litigant from working an injustice to the other. It follows, however, that if, as the defendants argue, the second corporation, whether original or amendatory of the first, was the first compliance with the Baums' agreement to form a corporation, they should transfer to the Bennetts one-fifth part of its capital stock, and the plaintiffs should be permitted to amend their petition so as to sustain a decree for a specific performance of the contract. In that event, the Baums should be permitted to issue to themselves without further consideration the remaining four-fifths of that stock. The assets transferred by them to the corporation are worth more than $200,000, and justice requires they should be thus protected. The proof does not warrant us in holding that Mr. Hall knew before the exchange was made that the capital stock of the second corporation exceeded that of the first. We are unable to agree with the plaintiffs that they should share in every subsequent increase of the capital stock without paying therefor. The contract does not so provide, nor is there anything in the record tending to prove that such an agreement was in the contemplation of the parties.

Rather the written memorandum, prepared by W. R. Bennett and subsequently produced at the dinner when the salaries to be paid to S. F. Bennett and to himself were discussed, contains an item to the effect that the Bennetts should have the privilege of subscribing for a *pro rata* share of any additional stock issued by the corporation, and might pay by note or in cash therefor. While these provisions do not appear in the contract, the memorandum is more convincing than counsels' argument concerning the intent of the parties, if that should be considered a controlling factor. The proof is clear that the Bennett Company incurred a large indebtedness to increase and successfully carry on its business, and that the Baums or the other corporations which they control are also liable for those debts. It is not just to require these sureties to lend their credit gratis to float that indebtedness and at the same time prevent the corporation from increasing and selling to the best advantage its capital stock to raise money wherewith to liquidate. that debt or some considerable part thereof. Of course, the existing stockholders should be given a reasonable opportunity to subscribe and pay for their *pro rata* share of this stock before an attempt is made to sell it to outsiders, and five days' notice we do not consider reasonable.

The defendants complain that there is no allegation in the petition to justify so much of the decree as quiets in the Bennett Company title to the real estate acquired by Mr. J. E. Baum from the W. R. Bennett Building Company, and we think there is merit in the contention. There are general charges in the petition that the Baums fraudulently diverted and converted the assets of the Bennett Company, but the referee specifically found that the proof did not sustain these charges. This finding is not excepted to and must be considered unimpeachable evidence of the fact. It seems to us that the Bennett Company should receive the legal title to the real estate described in the referee's findings; but there should be

allegations in the pleadings to sustain this part of the decree. We have not overlooked the principle of law which requires the stockholder, as a condition precedent to prosecuting a suit to reclaim for the benefit of the corporation its assets, to request those in charge of its affairs to commence the suit; but, in the light of all of the facts in this case, we shall not apply it. We have been impressed with the crying necessity of terminating this litigation in such a manner as to dispose of all the contentions of the interested parties, and shall endeavor to do so.

The Baum Building & Realty Company, in consideration for the Baums' agreement to transfer to it all of the real estate acquired by them from the W. R. Bennett Building Company, issued to them all of its capital stock; but the Baums did not transfer the legal title to the real estate. In so far as this stock, or that of its successor, may be in the hands of persons not parties to this litigation, it is controlled by the defendants Baum and was received with full notice of all of the plaintiff's equities, so that if it is lawful and just to sustain the referee's findings and the court's decree, quieting the title to the real estate in the Bennett Company, we should not hesitate to affirm that judgment, because of the alleged nonjoinder of parties defendant. The Bennetts and Mr. Hall, their trustee, accepted the Building & Realty Company's stock under the circumstances surrounding them when Mr. Hall accepted the stock of the Bennett Company; but we do not think the principles of estoppel apply with equal force to both transactions. The Building & Realty Company was created for the sole purpose of holding the title to this real estate for the benefit of the Bennett Company; it did not incur indebtedness on the strength of the reincorporation, nor do we think that the Baums will be prejudiced by consolidating in the Bennett Company title to all of the real estate of which it is the equitable owner. We can understand that it may have been wise to permit Baum and the Building &

Realty Company to hold the naked legal title to the real estate, carrying the net value of those properties on the books of the Bennett Company, as part of its assets, and thereby enable the Bennett Company to make a showing of net worth without exposing its liability for the incumbrances upon the real estate; but, while the net value of this real estate seems to have been and to be constantly and rapidly increasing, the Baums enter only about one-fifth of that value on the Bennett Company books, so that, should the plaintiffs desire to sell their stock, they will be greatly prejudiced by a condition which will create in the mind of an investor doubt concerning the actual interest which the Bennett Company has in that valuable real estate. But, however liberal we may desire to be in affirming a judgment, we cannot sustain a finding which is not responsive to any allegation in the pleadings, nor to a theory mutually adopted by the litigants in the district court. We have the authority to permit amendments in this court. We therefore shall permit the plaintiffs, if they are so advised by counsel, to amend their petition so as to allege such facts as will justify us in sustaining the decree quieting title in the Bennett Company to all of the real estate described in the referee's report, and to a decree for a specific performance of their contract for one-fifth of the $200,000 capital stock of the Bennett Company. Ordinarily such amendments would not be permitted. In the instant case counsel for the defendants strenuously objected to the introduction of all evidence touching title to this real estate. We are confident, however, that the defendants will not be prejudiced by the amendments, because all features of the transactions touching those subjects have been testified to by the only persons having knowledge thereof, and this litigation should cease at as early a day as possible.

The referee's statement of the accounts between the Bennett Company, on the one part, and J. E. Baum, D. A. Baum, the Baum Iron Company and the New Paddock-Hawley Company, on the other part, finds the

true balance in each account on the basis that all of the corporate stock issued by the second corporation is canceled. By reinstating that stock, no change is made in those accounts, nor should the Baums be charged any additional sum for the $160,000 capital stock of the Bennett Company we hold they are entitled to in consideration for the assets transferred, or agreed to be transferred, to it by them; the intention being to hold that the plaintiffs are entitled to one-fifth and the Baums to four-fifths of the capital stock of the Bennett Company as organized in 1904.

The defendants argue that since the Baums acquired title to the real estate theretofore held by the W. R. Bennett Building Company in the forenoon of the day the contract in suit was signed, and it was executed in the evening, no consideration sustains that contract. We find no such issue tendered by the answer, nor would the proof support it, if pleaded. It is evident that the purchase of the assets of the W. R. Bennett Company at trustee's sale, the subsequent transfer of the real estate owned by the W. R. Bennett Building Company, and the signing of the contract were all parts of the same transaction, and that an ample consideration sustains the contract.

Some criticisms are made with respect to the value placed by the referee upon the furniture, fixtures, vehicles and horses owned by the Bennett Company, and also concerning three items aggregating $3,137.77, which the defendants contend should have been charged to profit and loss. The three items we think should have been thus charged. We do not think it necessary to substitute our judgment for that of the referee and the district court concerning the value of the furniture, fixtures, live stock and rigs, because the defendants are not required to pay money or to declare dividends upon the basis of those findings and will be at liberty in the future transactions of the corporation's business to exercise a reasonable judgment concerning these items.

We find that the plaintiffs and the defendants should each pay their costs in this court, unless the plaintiffs refuse to amend their petition; in that event the plaintiffs will be taxed with all the costs in this court.

The judgment of this court is that the plaintiffs are given 40 days from the filing of this opinion to so amend their petition as to sustain the findings of the referee and the judgment of the court quieting in the Bennett Company title to all of the real estate described in those findings and to sustain a decree for a specific performance of their contract for one-fifth of the $200,000 capital stock of the Bennett Company. If those amendments are filed, the judgment of the district court will be modified so as to recognize the validity of the incorporation of the Bennett Company in 1904, and so as not to enjoin the stockholders of that corporation from lawfully amending its articles of incorporation or increasing its capital stock, and to compel the Baums to specifically perform their contract to deliver one-fifth of the capital stock of the Bennett Company to the plaintiffs. In all other things the judgment of the district court will be affirmed. If the plaintiffs fail to amend their petition as aforesaid, the judgment of the district court will be reversed, with directions to modify its judgment so as to conform to this opinion.

JUDGMENT ACCORDINGLY.