## Louisville & Nashville Railroad Company v. Ohio Valley Tie Company.

(Decided November 24, 1914.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, Second Division).

1. Damages—Special Damages—Misjoinder.—In a suit for damages to business and credit resulting from a series of malicious wrongful acts, the fact that each act named is ground for special damages, will not make a misjoinder when the damages are sought for the greater wrong.

2. Railroads—Shippers.—The law recognizes and establishes the right of a shipper to every privilege and facility for shipment accorded by a railroad company to other shippers.

3. Verdict—Excessive Damages.—Before the court is authorized to reverse because the verdict is excessive, it must be so excessive as to strike one at first blush as being the result of passion or prejudice.

4. Evidence.—The admission of incompetent evidence is not reversible error unless objected to at the time.

5. Damages.—In the face of a persistent and aggressive wrong, practiced for a purpose without justification in law or morals, it is not the policy of courts to draw close distinctions to determine with unerring accuracy whether the damage is too remote.

6. Abatement—Grounds—Pleading.—If the petition does not show the ground of abatement, a demurrer will not raise the question, and to rely upon it one must plead it affirmatively, else an answer will waive it.

7.  Abatement—Suits—Pending of Two Suits.—To abate an action by reason of the pendency of another suit, the two actions must not only be pending at the same time and prosecuted at the time the objection is made, and both be pending between the same parties, but they must both be prosecuted for identically the same cause of action.

8.  Jurisdiction—Interstate Commerce Act.—The Interstate Commerce Act does not deprive the State courts of their common law jurisdiction.

9.  Interstate Commerce Commission—Jurisdiction.—The Interstate Commerce Commission has exclusive jurisdiction to grant relief from unreasonable interstate freight rates and to establish reasonable ones.

10. Interstate Commerce Commission—Rates.—An order of the Interstate Commerce Commission as to the reasonableness of an interstate freight rate is conclusive, and a rate or classification of a commodity once established by it may be taken advantage of by anyone affected thereby.

11. Damages—Rates.—Reparation for damage by reason of unreasonable interstate freight rates may be sought either before the Interstate Commerce Commission or before the courts.

12. Interstate Commerce Commission—Rates.—The finding of reparation by the Interstate Commerce Commission for unreasonable rates on interstate shipments is merely a recommendation, for it cannot compel payment, and its orders in this respect are only prima facie correct.

13. Interstate Commerce Commission—Special Damages.—The fact that the Interstate Commerce Commission may have recommended the payment of special damage which flows from violation of a Federal law is no reason why the State court may not take cognizance of a suit based in part upon another result of that act, which, when connected with many other acts of a different nature, will show a wilful and malicious purpose, and give rise to a common law cause of action.

HELM BRUCE and BRUCE & BULLITT for appellant.

EDWARD W. HINES, JOHN BRYCE BASKIN and J. VAN NORMAN for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

This is an action by the Ohio Valley Tie Company to recover of the Louisville & Nashville Railroad Company $100,000 in damages for wilful and malicious injury to business, inflicted by withholding numerous conveniences and accommodations furnished other shippers, and by imposing extortionate freight rates and other annoying burdens not imposed upon other shippers. It charges all of this was done for the wilful and deliberate purpose,

not only of injuring appellee's business, but of destroying it and thereby eliminating it as a competitor of the railroad company along its line for the purchase of cross-ties. The jury returned a verdict against the railroad company for $56,971.56. From the judgment on this verdict this appeal is taken. The jury's verdict was itemized, that is, had special findings, and $50,000 was awarded for damage to plaintiff's business and credit; $5,000 injury to ties; $1,000 attorney fees; $771.56 expense of transferring ties; and $200 for loss of time and services performed.

Appellant contends there is no warrant in law for the recovery of any damages, and that, in any event, the verdict is flagrantly and grossly excessive.

The tie company was incorporated in 1903, with a capital of $50,000, but it did not locate its business on the lines of appellant until 1908. In the first year of its existence it handled about 250,000 ties; its business grew every year, and in the fiscal year ending September 1st, 1911, it handled 1,300,000 ties at a profit of $27,000, but in the fiscal year ending September 1st, 1912, its business was reduced to 1,000,000 ties, and a loss sustained of $28,000. Theretofore, it had never lost money, that is, its profits, beginning with $10,000 the first year, had gradually increased until the time of this loss in 1912. In order to understand the controversy, it should be explained that railroads maintain what are called class and commodity rates. A special rate is made to carry cheap and bulky commodities, which move in large quantities, like lumber, grain and raw ores. Higher rates are charged on other commodities in proportion to their value, cost of carriage, and liability to injury. Commodities of this kind are graded into 1, 2, 3, 4, and 5 classes, the highest charge being made for class No. 1, which includes the more valuable commodities, while the cheapest class rate is named on class No. 5, which includes such commodities as churns, chair stock, pails, pumps, farm wagons, wheel barrows, and a hundred others of that kind. The commodity rate on lumber is and was only about one-fourth of the 5th class rate.

In 1888, in the case of Reynolds v. Western N. Y. and Penn. Railway, 1 I. C. C., 593, it was held that interstate rates on cross-ties ought not to exceed the rates on lumber. We take these remarks from the ruling in that case:

"It requires no argument to prove that the placing of railroad ties in the same category with these articles

(5th class) is neither reasonable nor just. The mere fact that it is so found is sufficient of itself to suggest that it was placed there for some purpose not readily apparent and different from the reasons which ordinarily influence classification * * *."

"The ordinary conflict of interest between the railway and the shipper is here intensified by the fact that the direct interest of the carrier requires the cheapening of the shipper's product. It was candidly admitted by its general superintendent that this consideration influenced the conduct of defendant in fixing its rates upon ties at a time when its interstate rates were not subject to control under a law of Congress. But if this was legal then, it is no longer. It involved and implies extortion. It is not only repugnant to every man's sense of propriety and justice, but it is directly forbidden and made illegal by the third section of the act to regulate commerce, in that it subjects this particular description of traffic to undue and unreasonable prejudice and disadvantage for the pecuniary benefit of the carrier itself. It is a course of dealing if possible even more obnoxious to the just provisions of the act than would be a tariff arranged in the same manner for the purpose of giving a preference to another shipper competing from another direction in the same market.

"Rates established by a common carrier under the influence of a desire to keep upon its line material for which the road itself has use, or to keep the price thereof low for its own advantage, cannot be justified either in morals or in law. Every party who produces such material is entitled to sell it when he wishes in the best available market, and the common carrier has no right to prevent his doing so by disproportionate or unreasonable rates. This the defendants in the present case have been attempting to do."

In case No. 3136, Chicago Car Lumber Co. v. Louisville & Nashville, the Interstate Commerce Commission awarded reparation to the Chicago company for overcharges in rates the railroad had collected for carrying cross-ties as of the 5th class instead of upon the lumber or commodity rate. In that case the commission said:

"The commission has repeatedly held that the rate on ties should not exceed the rate on lumber from which they are made."

This complaint of the Chicago Lumber Company, above referred to, was of the same nature as the Rey-

nolds complaint, *supra,* and in each case awarded reparation to the claimant for the difference between the overcharges collected on cross-ties at the published fifth-class rate and what the charges would have been if based upon the commodity rate accorded to lumber, and made an order requiring the railroad company to establish and maintain, between the points which the shipments involved, a rate on cross-ties not in excess of the lumber rate. The Kentucky Railroad Commission in 1905 in case of Norman Lumber Co. vs. L. & N. R. R. Co. ruled to the same effect. Both the state and interstate commissions not only required establishment of lumber rates on cross-ties between the points named in the complaints, but severely condemned the old system of classification, and held that there was no justification for charging any more than the lumber rate on cross-ties between any points. If there was room for argument that these complaints, and the rulings of the commission thereon, were not sufficient to inform the appellant of the general policy of the commissions with reference to such classification, and the manifest iniquity of the fifth-class rate for cross-ties, the question is certainly settled beyond controversy by the Supreme Court in the case of Mitchell Coal Company v. Penn. R. R. Co., 230 U. S., 134, where it was decided that when once the Interstate Commerce Commission has condemned a rate or a practice, any other shipper may rely upon that ruling, and may bring suit without first going before the Commission. In this connection, it may be again noted that the practice of putting ties on any but the lumber rate was condemned as far back as 1888.

Until the summer of 1910, the appellant only collected for carrying cross-ties the amount of the lumber rate, although it is conceded that in its published tariff rates cross-ties were classified and listed in the fifth-class, so that nominally the rate on cross-ties was from 25 to 40 cents per cwt., while in practice it collected but 8 or 10 cents but cwt., the lumber rate. Since a cross-tie weighs 200 pounds, it will be seen that application of the fifth-class rate makes the freight equal the worth of the cross-ties, and amounts to prohibition of carriage. In 1908, when appellee began business along the appellant's lines, appellant was using approximately 500,000 ties annually, and it was paying for them about 35 cents each. This price plus the lumber freight rate to Louisville was about 20 cents less than their Louisville market value.

The appellee, relying upon the rulings of the State and Federal Commerce Commission with reference to cross-tie classification, and knowing that the appellant was not applying its published rates which had been condemned, and expecting a continuance of its practice of charging only lumber rates for cross-ties, as directed by the Commission, bought quantities of timber land, and sent its buyers in the territory served by the appellant, particularly along the line of its Owensboro and Nashville division, and began to make and purchase thousands of cross-ties.

Until the summer of 1910, the business of appellee in appellant's territory was carried on without annoyance or interference and it was making satisfactory profits. It entered into and was filling large contracts with the Pennsylvania, Nickel Plate, and the Big Four Railroad Companies. Ties for these contracts were shipped over the L. & N. billed to out of state destinations, and at Louisville were delivered by the L. & N. to these contracting carriers. During the summer of 1910, and without any warning to the appellee, the appellant began to apply its published tariffs, that is, freight-rates were charged as if ties were embraced in the fifth-class. The first notice the appellee had of this change was receipt by mail of debit memoranda from the railroads to whom it had consigned ties. Appellant had collected from them this excessive rate which it charged for articles in the fifth-class, and these consignees began to send notice to the appellee, as each car was received, that they had been compelled to pay the excess rate, and requesting credit for the difference on the books of appellee. About the same time, the appellee began to receive written requests from appellant to remit to it, and make good the amount of what it claimed was the undercharge they had been making for carrying cross-ties during the years past. In other words, appellant claimed that since it had been carrying ties on lumber rates in the face of its published tariff specifying a rate for cross-ties as of the fifth-class, it desired a remittance to cover the difference.

On July 29th, 1910, appellee addressed a letter to appellant in which it agreed to make remittance on condition that appellant would sign such a stipulation that could be brought to the attention of the Interstate Commerce Commission, and a ruling obtained on the authority of appellant to maintain or charge such excessive

rates. To this letter no reply was made, but in fulfillment of its contracts, appellee continued to ship to the railroads named, notwithstanding the ruinous rates, and very soon it had consigned 91 car loads upon which appellant collected and retained $6,200 in freight charges over and above the lumber rate. This change in the policy of appellant affected only interstate shipments. In other words, these excess charges were applied only on cars consigned to points outside of Kentucky. In seeking a way to evade the embargo thus laid upon its business, the appellee remembered that the Big Four and the Pennsylvania lines enter Kentucky at Louisville. Except such tracks as they have in Louisville, their systems are located outside of Kentucky, and all the ties that had been purchased by them were used and consigned to points in other states. The Nickle Plate had no track in Kentucky, and appellee was forced to give up that contract entirely, but as to the Pennsylvania and Big Four it hit upon the plan of consigning the cars to them at Louisville. Almost immediately after this method was attempted, the appellant began to apply the class rate on these shipments to Louisville, and very soon it had collected on 89 cars so consigned $8,100 more than the rate would have been for lumber, or than it had theretofore been collecting on cross-ties shipped between points within the state. Matters continued this way until the summer of 1911, when the appellant refused to deliver cars at Louisville consigned to these railroads, they having refused to pay the fifth-class rate. A suit was filed in the Jefferson Circuit Court for a mandatory injunction requiring a delivery of the cars on payment of the lumber rate, and to recover the $8,100 excess charges theretofore collected on the intrastate shipments. Appellant resisted the action on the ground that the purchasing carriers never intended to use them in Kentucky, and, although consigned to these carriers for delivery in Kentucky, the ultimate purpose was re-carriage to a destination along their lines outside of the State. The ties were, therefore, matters of interstate commerce, as it contended. In the lower court, the prayer of the appellee was granted, and judgment was given it for the overcharge, $8,100. The case was appealed to this court, L. & N. v. Ohio Valley Tie Co., 148 Ky., 718, and the judgment was affirmed.

We there held the ultimate destination was not the

controlling feature in determining whether the shipments were interstate or intrastate:

"As the contracts of shipment provide for transportation from points within the State to Louisville, another point within the State, it was entitled under its contract to the intrastate rate, a right which no purpose or subsequent conduct on the part of the purchasing carrier could in any way affect."

A writ of error was taken to the Supreme Court of the United States but abandoned, and the judgment paid before answering the case at bar.

When the case was decided by this court, and for the purpose of hindering the shipment of cross-ties off its lines, the appellant failed to furnish cars. Appellee would request cars for certain points and dates, and have its employees ready for work, and purchasing inspectors ready to take them up, only to find that an insufficient number, if in fact any cars had been furnished. The proof shows that adequate number of cars and shipping accommodations and facilities were afforded all other shippers for every other class and commodity. To avoid this practice, the appellee secured authority from the Pennsylvania and Big Four to tender, and did tender to appellant the cars of those roads, and this offer was refused. Such of its own cars as appellant did supply were not permitted to be carried off its lines, and when they reached Louisville, appellee was compelled to transfer the ties from cars on appellant's sidings to empty cars on nearby sidings of the Pennsylvania and Big Four. Notwithstanding this handicap, and extra expense, appellee continued its endeavor to fulfill its contracts with the roads named. Seeing that its efforts to thwart shipments of appellee were failing, appellant then, September 29th, 1911, issued an order to all of its agents that they should not accept for shipment any further cars of ties for the appellee when consigned in care of those railroads and their "deliveries," and the agents were directed to follow the instructions to the letter. In fact, acceptance of cars was limited to consignment direct to the appellee, or to the Pennsylvania, or Big Four, Monon, or B. & O. railroads, not their "deliveries." Observing that the Louisville Street Railway Company was not included within the list of favored consignees, if such they may be called, the president of the tie company went to see appellant's officials to inquire the meaning of this order, and was informed that ties consigned to Ohio Valley Tie

Company at Louisville, would be delivered to the "team tracks." These "team tracks" are in a part of the city remote from sidings of the railroads above named, and the result was that if any shipments were made, ties must be hauled or carted from appellant's "team tracks" across the city to the cars of the railroads named. This made further shipments impracticable, if not impossible.

Fifteen days before the issual of this order, the appellee had filed with the Interstate Commerce Commission at Washington, a complaint against appellant in which it asked that appellant be required to establish the lumber rate on cross-ties and sought reparation for the overcharge, $6,200, collected on the 91 cars before referred to. After appellant issued the order limiting tie consignment to its "team tracks," no further shipments were attempted. It had already been denied the privilege of shipping to the Nickle Plate. By the circular no facilities at all were offered for shipping to the Louisville Street Railway. In fact, the only purchaser or consumer left to the tie company was the L. & N. Railroad. With its business thus circumscribed, if not destroyed, it filed this suit in December, 1911, seeking to recover for the loss to its business and credit sustained by reason of all this wilful and malicious conduct of appellant.

As to the form and sufficiency of the petition it may be conceded that while it is made up of numerous separate causes of action, that is, each act of appellant above named would give ground for recovery of special damages, that fact will not make a misjoinder when damages are sought for the greater wrong and injury—loss and destruction of business and credit which all of these separate acts have brought about.

In Boyce v. Odell Commission Company, 107 Fed., Rep., 58, the court said:

"A series of wrongful acts all aiming at a single result and contributing to the injury complained of, to-wit, the destruction of one's business, credit and reputation may be counted on collectively, as producing the result in an action on the case."

In Jones v. Morrison, 16 N. W., 854, several distinct acts and transactions were averred to show one common purpose and the court said:

"If these several acts were separate and independent transactions, with no connection between them, they

could not be joined in the same complaint. But the general subject affected by the various acts is the same, towit, the rights and interests of plaintiff as a stockholder in the corporation. The complaint alleges a plan or scheme—a conspiracy—by Dorilus and Clinton Morrison to cheat and defraud him in respect to his rights and interests, and that the specific acts charged were done to carry the scheme into effect. If this were so, they were part and parcel of it, each specific act as much so as any other. The object of the action is to protect plaintiff's rights and interest as a stockholder in the corporation from the invasion contemplated by the conspiracy to undo what has been done pursuant to it, so that his rights and interest shall remain as though the conspiracy had not been attempted. It is immaterial that the acts differ in their particular character, that they were done at different times, and that the defendants do not all claim to be interested in, or benefited by each of them, or in the same degree in any one of them.''

In Standard Oil Company v. Doyle, 118 Ky., 662, which was an action to recover damages for an unlawful injury to business, this court held the petition was good, which described the greater offense by setting up the different acts which constituted it in the following language:

''By wanton and malicious interference with plaintiff's business and the conduct thereof in obstructing, harassing, and annoying plaintiff's servants and employes while engaged in the discharge of their respective duties in selling and distributing oils, etc., to plaintiff's customers and patrons, and by wilfully enticing, persuading, and otherwise influencing such servants and employes to leave plaintiff's employ against the will and consent of plaintiff; by threatening certain wholesale customers of plaintiff to shut them up in their business if they continued to purchase and deal in plaintiff's oils, etc., and by threatening both wholesale and retail customers of plaintiff, that it (the Standard Oil Company, aforesaid) would refuse to sell them oil, gasoline, and other commodities dealt in by said defendant as long as they continued to purchase such articles, or any of them, from plaintiff; by causing and procuring false and injurious reports concerning plaintiff and his business to be circulated in and about the city of Lexington, and published in certain of the daily newspapers of the city; by causing and procuring plaintiff to be arrested on various

charges of violating the ordinances of said city, and the criminal and penal laws of the city of Lexington and Commonwealth of Kentucky, and to be prosecuted therefor; and by divers and sundry wrongful acts to estrange and alienate the acquaintances, customers, and patrons of the plaintiff, to ruin, oppress, and impoverish the plaintiff, and drive him out of the business of contracting for the sale of oils, gasoline, etc.''

In the case at bar every act referred to was established beyond controversy, that is, they were not denied, and there was substantial admission that the purpose was to prevent or hinder the movement of cross-ties off its road, and this, of course, meant the elimination of appellee as a competitor and the destruction of its business. Appellant seeks to shift the blame for these drastic and arbitrary orders, and its refusal to furnish to appellee the same accommodations and facilities it was furnishing to other shippers of other commodities, by saying it was necessary to do so in order to circumvent appellee in the various steps which it was taking to avoid these orders and escape the effect of appellant's rules and regulations. But when it is remembered that these orders and rules and regulations were aimed at appellee alone, and to thwart it in the business which it had a perfect right to carry on, it becomes apparent that appellee was only exercising in a lawful manner its right of self-defense against the death blows, time and time again directed at it by appellant. Its right to every privilege and facility for shipment which it requested is recognized and established by law, and they were at the time being afforded to all shippers of other commodities.

As to the complaint that the verdict is excessive, it is directed at the $50,000 for injury to business and credit, and $5,000 damages to cross-ties, and we may say again, that before we are authorized to reverse for that reason the damages must be so excessive as to strike one at first blush as being the result of passion and prejudice. Appellant argues that the only damage proven to business and credit is the overcharge on the 89 cars of interstate and the 91 cars of intrastate shipments, and having paid that damage there is no proof to sustain the verdict of $50,000. At the time of the trial, the overcharge recovered in the State court on the 91 cars had not been paid. There was no plea of payment as to either, for, in fact, this action was not brought to recover such overcharge, and the court expressly in-

structed the jury that they should not consider or permit the same to enter into any amount of damage which they might award, and at the conclusion of all the evidence, all testimony with reference to cars shipped between points within the State was withdrawn from their consideration. But appellant says that although the jury were so instructed, yet, in proof of the malicious and deliberate purpose to destroy appellee's business, evidence of all the acts to hinder the business, including overcharge on these cars, was heard by the jury, and, in the assessment of general damage, it is inconceivable that the jury was uninfluenced by this proof of special damages, or that the verdict was not enhanced by reason of it. But, even if the proof in that regard was incompetent, its admission is not reversible error because it was not objected to. Appellant says it did not object to the testimony because it could not know how the court would instruct the jury with reference to it. But the practice for testing a ruling of the court, or the competency of evidence, is to object and except at the time. In considering the extent of damage it will be well to recall that these wrongful practices of appellant began in the year 1910, and culminated during appellee's fiscal year beginning September 1st, 1911. It was during that year it sustained the loss of $28,000. The year before it had a profit of $27,000. Measured by its past experience of gradually increasing profits, we are unable to see why it is not a fair conclusion that, but for the embargo laid on its business, its profits for 1912 would have been at least as much as the year before. Transform a $27,000 profit into a $28,000 loss, and a damage is shown in excess of that found by the jury. From the evidence it appears that appellee turned over its capital twice a year and, with its good credit, it was able to borrow freely, and this borrowed capital was likewise turned over as often. It is shown that one bank in Louisville, when it heard of the fight appellant was making, called one $40,000 loan. For at least two years appellee was deprived of profit from this borrowed capital by the injury to its credit, and was also deprived of more than $12,000 of its invested capital, by way of the excessive freight charges withheld by appellant; and it is hard to estimate how much longer will be the period that appellee will suffer from the injury to its credit, and how much time it will require to regain its customers. While it may be hard to estimate the length of time this loss of

business and injury to credit will continue, yet the fact
of loss in this way is not at all uncertain. The jury had
a right to take these things into consideration, and to
conclude that simple interest would be poor compen-
sation for capital thus tied up and credit so injured. In
the face of a wrong so persistent and aggressive, prac-
ticed for a purpose without justification in law or morals,
it is not the policy of courts to draw close distinctions in
order to determine with unerring accuracy whether in
all the damages, which certainly were sustained, some
were not too remote for recovery. But the damages re-
ferred to above are not remote, and they are such as
naturally flow and were in contemplation of the party
guilty of the wrong.

In Gregory v. Slaughter, 124 Ky., 345, an action for
tort for negligence merely, this court asks the question,
"If there is uncertainty ought not the doubt be resolved
in favor of the innocent and not the guilty?"

As said in the case of Gildersleeve v. Overstolz, 90
Mo. App., 518:

"In the case at hand the defendant's conduct was so
lawless and malicious that on that ground alone he might
properly be held responsible for damages more indefi-
nite than in ordinary instances where evidence of malice
and oppression were lacking."

In Kentucky Heating Co. v. Hood, 133 Ky., 383, the
court held that a gas company, whose employes wrong-
fully severed the connections by which a rival company
was supplying gas to heat a house, in which rooms were
let to boarders, was liable in damages not only for the
cost of replacing the connections, but also for reasonable
compensation for the loss sustained by the removal of
tenants, and also for personal inconveniences and dis-
comforts, although no wrong was intended.

The court said:

"It would fall short of the relief to which appellee
was entitled to limit her recovery to the money she was
required to pay out to have the injury repaired. A per-
son cannot either negligently or wantonly injure the
property of another, thereby causing the other to suffer
loss in business or profits, or in the denial of the ordi-
nary and reasonable comforts he enjoyed, and then as-
sert that all the injured party is entitled to receive is
the cost of replacing the injured property. Waiving,
for the moment, the question of exemplary damages, we
may lay it down that, whenever a person is injured in

his person or property by the wrongful acts of another, he is entitled to recover such a sum as will fairly compensate him, not only for the actual loss sustained, but for such consequential damages as may spring from the deprivation of business or profits as are the direct or proximate result of the tort complained of, if such consequential damages are capable of reasonable ascertainment; and in addition thereto, the facts justifying it, compensation for personal inconvenience and discomfort."

In Allison v. Chandler, 11 Mich., 542 (551), which is also cited with approval in Gregory v. Slaughter, *supra*, the court said:

"It has been frequently said that the rule of damages where there is no fraud, wilful negligence, malicious oppression, etc., is the same in actions of tort as in those upon the contract. But though the remark is doubtless true in its application to those cases of tort where, from the nature of the case, elements of certainty exist, by which substantial compensation may be readily estimated, and other cases which are but nominally in tort, we do not think it can be accepted as a principle of universal application; or, in our opinion, can it be justly applied to any case of actually aggressive tort where from the nature and circumstances of the case itself no such elements of certainty are found to exist or none which apply substantially to the whole case."

Appellee's damage is of a continuing nature. When one's credit is injured, and his customers are lost because of contracts broken, and his competitors are enabled to take his place, it is harder to win back their favor and re-establish himself in the business world than it was to start in the first place. From one lost customer alone, the Nickle Plate, appellee had an annual profit of from $5,000 to $8,000. As was testified to by Mr. Bush, president of appellee, "The Nickle Plate railroad goes through a section of country where there are a large number of industries and manufacturing concerns, and those concerns with their various switches use a low grade of ties, and they made a market for ties which the Big Four and the Pennsylvania would not use for their regular tracks, and enabled us to get rid of all kinds of ties that we made or bought."

In a business like appellee's, many ties of this character accumulate, and by being deprived of the privilege of shipping them over the Nickle Plate lines, it lost a

market for such ties, and this loss was not only a present damage but likely to continue for years. In other words, it is short of the truth to say that appellee's loss of business, and loss of its place in the business world are restored merely by re-establishing a proper cross-tie rate, or by again offering fair facilities for shipping, or by a repayment of its capital which was wrongfully withheld.

But appellant argues that this $50,000 verdict, necessarily includes the $12,000 of excessive freight charges, which appellee was seeking to recover by other suits, although part of these overcharges were paid back before the trial, and the remainder have been paid since. We do not believe the record justifies the conclusion that these excess charges were included by the jury in the damages awarded. When the testimony was given as to the $28,000 loss for 1911 and 1912, fiscal year, only one action was pending, and that, which originated in the State court, was on appeal to the United States Supreme Court. The fact that an action was pending is proof to show that the amount involved was carried on the books as assets. Entertaining this hope of collecting the claims, in view of all former rulings of the State and Interstate Commerce Commissions, is it reasonable to believe that they had been charged off as a loss? Appellant made no effort by cross-examination or otherwise to controvert or impeach the positive testimony as to this $28,000 loss, and when there is absolutely no proof to the contrary, the jury were certainly warranted in accepting the statement as true.

Although permitted, the jury did not award punitive damages. Although permitted to take into consideration the continuing nature of the injury, and allow compensation for more than the loss actually sustained during the fiscal year 1911-12, it does not necessarily follow that they did so, because the amount allowed is not as much as the loss sustained in that year.

As to the $5,000 allowed as damage to cross-ties, appellee's president is the only witness to testify. He swears the loss was $10,000. From his evidence, it appears that in the summer of 1911, appellee had over 20,000 ties on appellant's track, ready for shipment, and these were damaged 50c each by exposure to the weather due to delay in shipment; that in six months a tie will speck and be so damaged as to be rated as a "cull," and that when this suit was tried, about eighteen months afterwards, most of them were still on the track. But

appellant says, this delay was not so much due to its failure to furnish cars to move the ties as it was to appellee's failure to get a customer for them. It proves that a short while before the trial, it called upon appellee to ship them and get them off the right-of-way, and that appellee responded that it had succeeded in getting a customer and would endeavor to move them without delay. But it failed to do either. When the proof in the whole case shows very clearly that the necessity to get a customer was forced by the loss of those it had, and that they were lost by reason of appellant's wrongful acts, it should not now be permitted to urge, by way of defense or extenuation, the result of those wrongful acts.

The appellant next offers as a bar to the prosecution of this action, the fact that appellee elected to go to the Interstate Commerce Commission with complaint of unreasonable rates, and asked damages on that account. It argues that to permit appellee to recover other or additional damages growing out of or incidental to the acts complained of will be a direct violation of the Interstate Commerce Act. To support its contention, it relies upon Section 9 of the Act:

"Section 9. That any person or persons, claiming to be damaged by any common carrier subject to the provisions of this Act, may either make complaint to the Commission, as hereinafter provided for, or may bring suit, in his or their own behalf, for the recovery of the damages for which such common carrier may be liable under the provisions of this Act, in any District or Circuit Court of the United States of competent jurisdiction; but such person or persons, shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt."

We do not believe this position is tenable for three reasons: (1) This objection should come by way of a plea in abatement, and, (2) The Interstate Commerce Commission as to damages is not a court, and its finding in that regard is evidently merely—neither binding nor conclusive; and (3) The instructions of the court prevent an allowance of anything for excess freight or any damage by reason of the act of charging excess freights.

The answer does not refer to the pending complaint before the Commission. But appellant argues that the question is raised on its demurrer, for the petition, as it

says, shows that the action was then pending between the same parties and that they were the same causes of action.

If the petition does not show the ground of abatement, then, of course, a demurrer will not raise the question. In such cases, if defendant desires to rely upon it, it must be affirmatively plead, otherwise the answer will be deemed a waiver. To see if the petition shows the state of facts relied on by appellant to abate the action, we measure it by Newman on Pleading and Practice, Section 392b.

"In order to abate an action by reason of the pendency of another suit, the two actions must not only be pending at the same time and prosecuted at the time the objection is made, and both be pending between the same parties, but they must both be prosecuted for identically the same cause of action."

The petition, in recounting the numerous wrongs inflicted upon it by appellant in furtherance of its malicious purpose to destroy appellee's business, avers among others that it had been forced to employ attorneys and institute actions, and that there was then pending in the State courts suit for mandamus and recovery of freight overcharge on the 91 cars, and a complaint before the Interstate Commerce Commission against the unreasonableness of the published freight rates, and for reparation of the overcharge on 89 cars. Manifestly the action in the State court and the complaint before the Commission were of a special nature, seeking special relief not obtainable elsewhere or otherwise. But this action is to recover general damages as a result of numerous wrongful acts, and although the overcharges which form the basis of the special suit and the complaint above referred to, are among the many wrongs alleged in the petition, we cannot see how judgment or proceedings in the special actions should operate as a bar to the prosecution of this, or the fact that they were then pending, could serve to abate it. Although they were between the same parties, the causes of action were not identical.

The case in the State court was for a mandatory injunction to compel the appellant to carry and deliver cars to the Pennsylvania and Big Four in Louisville, as being intrastate shipments, and to recover the excess charges it had collected on 91 cars theretofore shipped under the same conditions. It was an action in equity and to recover special or incidental damages. While

this is an action at law, to recover all the other damages, sustained over a longer period of time, which resulted from that and many other wrongful acts.

In Walker v. Mitchell, 18 B. Mon., 541, the lower court held that the plaintiff having, in an action to recover land, elected to sue also for damages for the detention of the land, was precluded by the judgment in that case from subsequently recovering damages of any kind for the detention of the land which might have been recovered under the allegations of his pleadings in that case.

But this court said:

"But in this case the plaintiff claimed in her petition, a right to recover for the extraordinary expense incurred in her action for the recovery of the land, and as these expenses could not well have been recovered in that action, and were not set up or embraced in the petition in terms, or by any fair or reasonable construction, she could not, as to those expenses, have been barred by the former recovery; it results, therefore, that the court below erred in giving judgment in bar of the claim to recover the reasonable fees she had paid, or was bound to pay, to counsel for services in and about the recovery of the land.

The case of Crockett v. Miller, 112 Fed., 729, was an action to recover against a sheriff damages for wilfully and maliciously levying an execution upon plaintiff's property with intent to destroy her business credit and standing. Defendant plead in bar a judgment in a former action between the same parties in which the plaintiff recovered the property wrongfully seized, with statutory damages for the unlawful detention. The court said:

"As a result of a careful examination of many cases, not only those to which our attention is called by defendant's counsel, but many others to which we have given critical attention, we think the rule may be safely stated as follows: That the only damages which can be recovered by a plaintiff in an action of replevin under the statutes of Nebraska as construed by the Supreme Court of that State, where the property has been delivered to the plaintiff, are interest on the value of the property during the time plaintiff is deprived of its possession, the injury or damage done thereto by the officer in taking the same and while in possession thereof, and, in some cases, the usable value or the value of the use of the

property while so detained. This we believe to be the New York doctrine, and is substantially the doctrine of the State of Nebraska, as we understand the decisions.

"Accordingly it follows that the collateral or consequential damages occasioned by a seizure of property by the officer against whom the replevin suit is brought, such as injury to the business reputation, credit, and standing of the plaintiff occasioned by the malicious conduct of the officer making the seizure, coupled with the express purpose and intention of so injuring the plaintiff, are not within the purview of the statutory damages flowing from the unlawful detention of property within the meaning of replevin acts. They are totally different from them in that they do not flow proximately from the act of detention merely, but are special and consequential damages, arising out of facts specially pleaded in this case showing an intention to inflict them.

"It is more obvious that the other element of damages, namely, the attorney's fees and expenses of the plaintiff in asserting her claim and defending her title to the property seized by the sheriff, could not have been introduced into the replevin suit. It was for service rendered and expenses incurred in that suit that the plaintiff was damaged, and, in the absence of some statutory provision permitting recovery therefor in the suit itself, it is obvious that if the necessary pre-requisite element of malice existed she was required to institute another and different suit therefor. The trial court limited plaintiff's right of recovery in this action to such damages as she might have sustained by reason of loss of business credit and by reason of expenses incurred in the prosecution of the replevin suit, carefully withdrawing from the jury any consideration of damages occasioned by reason of the detention itself of the property. There was no exception taken to the court's direction with respect to damages. In other words, it was conceded at the trial that, if plaintiff was entitled to recover at all, she was entitled to recover the two items last alluded to. For the foregoing reasons, the defendant's contention that the claim asserted in this action is *res adjudicata* can not prevail.

"For like reasons, also, there is, in our opinion, no merit in the theory of estoppel, by splitting the cause of action, as argued by defendant's counsel. If the damages resulting to plaintiff's business standing and credit, as a consequence of the malicious conduct of the sheriff,

could not have been recovered in the replevin suit, surely the plaintiff should not be punished for not attempting to do so."

As above stated, the action in the State court was in equity, and to secure extraordinary relief in the way of shipping facilities and to recover special damages. At that time appellant's malignant purpose was not apparent, and the greater damage in the way of a destroyed business had not been sustained.

The same is true of the complaint filed with the Interstate Commerce Commission for damages due to violation of that statute. Moreover, the State courts retain their common law jurisdiction, and this action is purely of that character, and no attempt is therein made to recover any statutory damage allowed by the Federal Commerce Act. The court, by instructions, expressly forbade such recovery. The complaint before the Commission was as to only one species of wrong, viz.: Overcharge on interstate shipments, and, as a result, the Commission awarded, or recommended, the repayment to appellee of the difference between the lumber and the class rates.

In order to get relief from an unreasonable interstate rate, and have a reasonable one established, the initial step must be taken with the Commission. Its jurisdiction in that respect is exclusive and naturally the appellee went there to invoke it. If in condemning the rate, the Commission recommended reparation of the overcharge, whether requested or not, certainly that fact cannot be urged against the prosecution of this action, when there is no attempt to recover the same damage. The basis of this action is a series of wrongful acts, each repeated many times, and all of them go to produce one result, and the damage from that one result is this cause of action which is almost entirely beyond the cognizance of the Interstate Commission. By way of damage relief, the Commerce Commission has but little power. The only binding and effectual order it made in this case was in the establishment of a reasonable rate. Its award of damages, as before stated, amounted merely to a recommendation, and its value to appellee, in the event appellant refused to be governed by the recommendation, was only as prima facie evidence, which it might use to support a cause of action. Its orders as to reasonableness of a rate are conclusive, and when once the principle of a rate or classification of

a commodity has been approved or condemned by the Commission, it is given general application, and any shipper who has been or may be affected may take advantage of the ruling and seek reparation. He may seek the reparation either before the Commission or before the court, but if before the Commission, the only relief it can afford is a recommendation, for it cannot compel payment. Its order in this respect is only prima facie correct. Mitchell Coal Co. v. Penn. R. Co., 230 U. S., 247. As the fifth-class rate on cross-ties had been condemned years before, the practice of appellant in maintaining it and charging under it constituted one, but only one, of the acts complained of to show that appellant's practice was wilful and malicious, and with intent to injure plaintiff's business. While in this case no attempt is made to recover the excess freight collected, it was competent and proper to allege and prove those acts along with the many others to establish the motive actuating the practice of appellant with reference to appellee's business.

In our opinion, the fact that the Interstate Commerce Commission may have recommended the payment of special damage which flows from violation of a Federal law is no reason why the State court may not take cognizance of a suit based in part upon another result of that act which, when connected with many other acts of a different nature, will show a wilful and malicious purpose, and give rise to this common law cause of action.

Perceiving no reason why the judgment of the lower court should be reversed, it is affirmed.